# SOUTHERN PACIFIC TERMINAL COMPANY *v.* INTERSTATE COMMERCE COMMISSION AND YOUNG.

# YOUNG *v.* INTERSTATE COMMERCE COMMISSION ET AL.

## APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF TEXAS.

Nos. 459, 460.   Argued December 9, 1910.—Decided February 20, 1911.

The case is not moot where interests of a public character are asserted by the Government under conditions that may be immediately repeated, merely because the particular order involved has expired. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290, 308.

The rule that this court will only determine actual controversies, and will dismiss if events have transpired pending appeal which render it impossible to grant the appellant effectual relief, does not apply to an appeal involving an order of the Interstate Commerce Commission merely because that order has expired. Such orders are usually continuing and capable of repetition, and their consideration, and the determination of the right of the Government and the carriers to redress, should not be defeated on account of the shortness of their term.

The Interstate Commerce Commission has jurisdiction to regulate charges of a terminal company which is part of a railroad and steamship system and operates terminals such as those of the Southern Pacific Terminal at Galveston, Texas.

Verbal declarations cannot alter facts; and although the different parts of a system may be separate as regards their charters, each forms a link in the chain of transportation. One of the separate links in a system controlled by a holding company such as the Southern Pacific Company cannot escape regulation by the Commission, because designated as a wharfage company; its property is necessarily employed in the transportation of interstate commerce.

All shippers must be treated alike; and, under the facts in this case, an arrangement, involving the lease of a wharf at a stipulated rental, between the shipper and a corporation whose wharves and terminal facilities thereon form links in a chain of interstate transportation, amounts to an unlawful or undue preference under the Interstate Commerce Act, the Commission having found the facilities amounted

to an absolute advantage to the favored shipper, and that similar facilities could not be given to other shippers.

Where a means of interstate transportation is used to give one shipper an undue preference, the traffic comes under the jurisdiction of the Interstate Commerce Commission.

Goods actually destined for export are necessarily in interstate, as well as in foreign, commerce, when they actually start in the course of transportation to another State or are delivered to a carrier for transportation, *Coe* v. *Errol*, 116 U. S. 577; this is the same whether the goods are shipped on through bills of lading or on an initial bill only to the terminal within the same State where they are to be delivered to a carrier for the foreign destination.

THIS is a bill in equity to enjoin an order of the Interstate Commerce Commission requiring appellants to cease and desist, on or before the first day of September, 1908 (subsequently postponed to November 15, 1908), and for a period of not less than two years thereafter, from granting and giving undue preferences and advantages to one E. H. Young, a shipper of cotton seed products at the port of Galveston, Texas, through failure to exact from him payment of wharfage charges for handling cotton seed cake and meal over the wharves, docks and piers of appellants, while at the same time exacting such charges from other shippers of cotton seed cake and meal, and from giving and allowing him or any other person whomsoever, for his exclusive use, space on the wharves of appellants at Galveston for use in the storage and handling of cotton seed cake and meal, while contemporaneously refusing and denying similar privileges to other shippers under substantially similar circumstances and conditions.

Young was not a formal party before the Interstate Commerce Commission. However, he was made a respondent in this suit, and filed an answer and cross bill. The Commission demurred to both bill and cross bill, and, the demurrer being overruled, answered.

On final hearing the case was submitted upon an agreed statement of facts, and both bills were dismissed.

The most important facts we set out below and in the opinion. We refer to the report of the Interstate Commerce Commission for further details.

The Republic of Mexico conveyed to one Menard the property upon which the wharves of the Terminal Company are situated. Menard conveyed the property to the president and directors of the Galveston City Company, who conveyed it to Collis P. Huntington for the sum of $200,000, and it is recited in the deed to him that it "is made upon the further Express Covenant and condition as follows: . . . when through and by means of such acts of Congress, act of the legislature, and ordinance and conveyance from the city of Galveston, if any, as may be required for the purpose, . . . the right has been secured to the said Collis P. Huntington, or his heirs or assigns, to construct piers, as he or they may from time to time determine, . . . then and in that event the said Collis P. Huntington, his heirs or assigns, will within six months thereof commence the construction of terminal facilities upon the property . . . for the use of what are commonly called the Southern Pacific Railroad and Steamship Systems."

The city of Galveston, on the fourth of February, 1899, passed an ordinance which recited the conditions of Huntington's purchase to be as above stated, and that it was greatly to the interest of the city that the work contemplated by him should be performed, and that for the proper utility of the property no streets should be opened through or across it, and it was ordained that streets, avenues or alleys, if any, theretofore opened, laid out or in any manner designated upon the property be perpetually abandoned, discontinued and closed. And Huntington, his heirs and assigns, were granted the right perpetually to construct and maintain piers as he or they might from time to time determine, "and to maintain upon the property terminal facilities for the use of what are commonly

called the Southern Pacific Railroad and Steamship Systems, their successors or assigns." It was provided that if Huntington should "charge wharfage for the use of such piers and other facilities upon said property, except so far as wharf service" might be covered by the freight rate, all such wharfage should be subject to the regulation of the railroad commission of Texas. And it was recited that it was greatly for the public interest that the property "should be developed for shipping and transportation purposes, and that the shipping facilities of the port of Galveston should be thereby improved and enlarged in order to better accommodate the commerce of the port and State. . . ."

The ordinance was ratified by an act of the legislature approved May 1, 1899. The act set out the ordinance in full and relinquished to Huntington the title and claim of the State to the property upon the conditions expressed in the ordinance and, in addition to subjecting the wharfage charges to regulation by the railroad commission, required an annual report to that body. And it was provided "that the system of railroad tracks" which might be constructed by Huntington on the property should connect with the track of any railroad company which might be built to the property, at a place designated; and, further, that there should be no consolidation of the property, or the stock or franchise of any corporation which might own or control the same, with the Galveston Wharf Company or any other wharf company by which the "wharf or other terminal charges should be fixed," and that "no charter formed for the use, operation and management of the property" should be granted without containing the section providing as above.

Huntington performed the conditions expressed in the conveyance and in the ordinance and the act of the legislature.

The Southern Pacific Terminal Company is a Texas

corporation, organized in 1901 to construct and maintain wharves and docks for the accommodation of all kinds of vessels, "and to avail of, use and enjoy the properties, rights, privileges and franchises granted and described and referred to in the act of the legislature of the State of Texas of May 1, 1899, ratifying the ordinance of the city of Galveston, and to construct and maintain upon the property terminal facilities for the use of what are commonly called the Southern Pacific Railroad and Steamship Systems."

At the time of the incorporation of the Terminal Company the following were commonly referred to as the Southern Pacific Railroad and Steamship Systems: the line of steamships owned by the Southern Pacific Company, running from New York to Galveston and New Orleans, and also running from and between the latter city and Havana; Morgan's Louisiana and Texas Railroad and Steamship Company; the Louisiana Western Railroad, which leads from New Orleans to the Sabine River; the Texas and New Orleans Railroad, leading from that river to the city of Houston; the Galveston, Harrisburg and San Antonio Railway, and the railroads in which the Southern Pacific Company owns stock, extending from the connection of the latter in El Paso at the Rio Grande River to San Francisco. Each of the railways was incorporated as a separate and distinct railway and has its own officers and board of directors, but the Southern Pacific Company owns ninety-nine per cent of their stock and the same per cent of the stock of the Terminal Company. The two latter companies have the same president, and the Galveston, Harrisburg and San Antonio Railway Company and the Terminal Company have the same general manager.

Import and export traffic passing through Galveston passes over the wharves of the Terminal Company, and the only track facilities for such traffic are those owned by the

Terminal Company on its own lands. And the Galveston, Harrisburg and San Antonio Railway is the only railway having physical connection with the tracks of the Terminal Company, and it does all of the switching to and from the tracks of the Terminal Company, charging $1.75 per car. The latter company receives a trackage charge of 50 cents per car.

The Terminal Company owns no cars or locomotives and issues no bills of lading. It owns no stock in any of the railroads or corporations in which the Southern Pacific owns stock. It carries on a wharfage business and publishes a schedule of charges for such business, which, however, is not filed with the Interstate Commerce Commission, its charge being twenty cents per ton on cotton seed meal and cake passing over its docks, and is shown as wharfage charge in the tariffs of the Galveston, Harrisburg and San Antonio Railway Company and all other railways entering Galveston. Such tariffs do not show that any exception is made as to the docks occupied by E. H. Young as hereinafter shown, but as a fact the wharfage charge is not imposed by the Terminal Company on the cotton seed meal and cake handled over the dock of E. H. Young other than as the same may be included in the general lease or contract price fixed as hereinafter indicated.

The Terminal Company was a party to numerous circulars issued by the Southern Pacific Companies, known as the "Sunset Route," so termed, principally for advertising purposes. The circular of May 24, 1907, shows terminal charges (other than storage and switching). At the port of Galveston the circulars show a charge of one cent per 100 pounds on cotton seed cake and meal.

The Terminal Company has on its property two piers, known as pier "A" and pier "B," and has erected on them all facilities for handling imported and exported freight, and all freight which may come to or pass over its

wharves, and it has abundant land under water upon which to erect other piers if they should become necessary.

It charges a fixed wharfage for all freight passing over its piers to or from vessels berthed thereat. The Galveston Wharf Company affords similar public wharfage facilities at the port of Galveston, having a number of piers. If the facilities of the Galveston Wharf Company should be destroyed those of the Terminal Company would become inadequate for handling the import and export and coastwise business. Ships to and from foreign ports, and coastwise ships other than those of the Southern Pacific Company, berth at piers "A" and "B," and there receive and deliver freight, and at these piers the Terminal Company carries on its general wharfage business.

In the building of pier "B" it was necessary to dredge a slip west of it, where ships could berth, and in order that the soil, through the action of storm and wave, should not drift into the slip, a bulkhead was built. To the westward of the slip the lands of the Terminal Company were lying idle and useless, they not being needed by it, and in pursuance of negotiations with Young the company proceeded to construct a pier, known as pier "C," for the use of Young, and to erect thereon a warehouse, shed and platform for his use, the original construction and subsequent enlargement of which cost the company about $65,000. At this time the pier is 300 feet wide at its widest part and about 1,400 feet in length.

The negotiations terminated in a lease under which Young is to pay the Terminal Company a yearly rental of $15,000, payable monthly from the first day of November, 1906. And he agrees that he will route all shipments of cotton seed and cotton seed products purchased or shipped by him "over the lines of said Terminal Company and its connections, according to the instructions of said Terminal Company from time to time," and that he will insist upon and enforce such routing, except where the

enforcement will prevent him from purchasing such products or from obtaining shipments which will be ready to move immediately and for which cars cannot be procured for the routing required. It is provided, however, that Young shall not be bound by these provisions if the rates be not equal to or lower than those of other competing lines or the service be not as adequate, but notice is to be given of such lower rates and service and an option to meet them.

The business of Young is that of a merchant and manufacturer, engaged in buying, selling and converting cotton seed cake and meal for his own account. He took possession of pier "C" and the improvements erected thereon by the Terminal Company under his contract with the latter company, paying the price stipulated in the contract, and has placed thereon cake, sacking and grinding machines, representing an investment of $50,000. Young's business consists in buying cotton seed cake in the interior, shipping it to himself by carloads at pier "C," there grinding it into meal, sacking it and loading it into steamships berthed at pier "C" for export.

All cotton seed meal cake passing over piers "A" and "B" pays a wharfage of 20 cents per short ton. Young pays no wharfage or storage charge other than as the same may be included in the rental of $15,000 per year. If any exporter handles cotton seed meal or cake over pier "C" the wharfage of 20 cents per ton is paid by him to Young.

Young has certain advantages by reason of his contract with the Terminal Company, which are enumerated in the agreed statement of facts and the result of which is stated as follows: "He makes a sum equal to 30 or 40 cents per ton more than he would receive if he handled his export product under methods in existence before he established his plant on pier 'C' and adopted the method of business he follows. This 30 to 40 cents per ton is in addition to the ordinary buying and selling profit." He

at times pays more for cotton seed cake than his competitors can afford to pay, and at times he can undersell them in European markets, and since he commenced business some of the exporters who were engaged in business when he commenced have ceased exporting. A comparison of his business with that of all other exporters of cotton seed cake shows that from September 1, 1906, to September 1, 1907, he exported 105,000 tons of cotton seed cake and about the same amount of cotton seed meal; they, 50,000 tons of both products.

"Some of the cotton seed cake producers at interior mills in the State complain that Young is able to dominate the Texas market, and that his method of conducting business at Galveston enables him to command the foreign trade and may become a detriment to the cotton seed cake and meal industry, in that Young might acquire a monopoly. Others entertain a contrary opinion. They all agree that if there was a general establishment of plants in Galveston, so that a monopoly could not be acquired, it would be of great benefit to the cotton seed industry.

    *      *      *      *      *      *      *      *

"On the present constructed docks of the Galveston Wharf Company and the Terminal Company, with the structures as now located thereon, there is not space enough to furnish all exporters doing business at Galveston with space for erecting machinery and handling export business in the same manner as is done by Young."

This proceeding was instituted September 11, 1907, by Carl Eichenberg, an exporter of cotton seed and its products from the port of Galveston, by filing his complaint or petition before the Interstate Commerce Commission against the Southern Pacific Company and the Terminal Company, complaining that the companies, by the arrangement with Young, were violating § 3 of the act to regulate commerce, by giving him an undue and un-

reasonable preference and advantage over his competitors.

By order of the Commission the Galveston, Harrisburg and San Antonio Railway Company and other railroad companies entering Galveston were made parties defendant.

Answers were filed and full hearing was had by the Commission, which on June 24, 1908, made its report and order.

No rehearing was asked by defendant before the Interstate Commerce Commission. Young was not made a party to the proceedings before the Commission, but he appeared and testified as a witness for the Terminal Company, and his counsel was present at the hearing when the testimony was taken and engaged in the examination of witnesses. Young was also present when the case was argued and submitted.

*Mr. Maxwell Evarts,* with whom *Mr. F. C. Dillard* and *Mr. H. M. Garwood* were on the brief, for appellants:

The Interstate Commerce Commission cannot deny to a wharf company, chartered under the laws of the State of Texas, the power to lease or convey real estate which it owns in fee simple and its title to which has been sustained. See *Galveston v. Menard,* 23 Texas, 408; *Texas v. Galveston,* 38 Texas, 13; *Galveston Wharf Co. v. Galveston,* 63 Texas, 14; *Galveston City Co. v. Galveston,* 56 Texas, 486.

The supposition of the Interstate Commerce Commission that the title to the property was acquired by the ordinance of the city of Galveston and the special act of the legislature approving the same is not correct. The contract between the Terminal Company and Young is not in violation of the terms of the grant. The owner of property abutting upon a navigable stream can devote it to other purposes than that of a public wharf. *L. & N.*

*R. R. Co.* v. *West Coast Co.*, 198 U. S. 483; *Atchison &c. Ry. Co.* v. *D. & N. O. R. R. Co.*, 110 U. S. 667; *Weems Steamboat Co.* v. *People's Steamboat Co.*, 214 U. S. 345.

Although interstate commerce may pass over a wharf, that wharf may be strictly a private wharf, and the owner does not become a common carrier subject to the jurisdiction of the Interstate Commerce Commission. The right to erect a landing on a navigable stream has its foundation in the ownership of the land, and when erected by an individual or corporation at its own expense, such landing is private property. *Leverich* v. *Mayor of Mobile*, 110 Fed. Rep. 170; *Compton* v. *Hankins*, 90 Alabama, 411; *O'Neill* v. *Annett*, 27 N. J. L. 290; *Woodruff* v *Havemeyer*, 106 N. Y. 129.

Even if the Terminal Company were a common carrier, and if the jurisdiction of the Interstate Commerce Commission were unquestioned, it nevertheless has the right to sell or convey unused portions of its property which it owns in fee simple. *Calcieu Lumber Co.* v. *Harris*, 77 Texas, 18; *A., T. & S. F. Ry. Co.* v. *D. & N. O. R. R. Co.*, 110 U. S. 667, 682; *Missouri Pacific Ry. Co.* v. *Nebraska*, 164 U. S. 403.

An order of the Interstate Commerce Commission which forbids a wharf company from using, by way of lease, its property for warehouse and manufacturing purposes, effectually confiscates private rights. *Central Stock Yards Co.* v. *L. & N. Ry. Co.*, 192 U. S. 568; *United States &c.* v. *Oregon R. R. & Navigation Co.*, 159 Fed. Rep. 975.

The Southern Pacific Terminal Company is not a common carrier and is not subject to the jurisdiction of the Interstate Commerce Commission. It does not fall under cases where, for the purpose of evading laws criminal in their character, holding companies have been organized as a part of what is in reality a conspiracy to evade the law, as was the case in *Northern Securities Co.* v. *United*

*States*, 193 U. S. 197. By its charter it is authorized to purchase stocks and other classes of securities. The mere fact that it also owns the stock of a common carrier cannot operate to consolidate and make a corporation a wharf company and a railroad company, any more than it could turn a corporation into a banking corporation and a railway corporation, the stock of which it chanced to buy in the open market. *Pullman's Palace Car Co.* v. *Missouri Pacific Ry. Co.*, 115 U. S. 587; *Peterson* v. *C., R. I. & P. Ry. Co.*, 205 U. S. 364; *United States* v. *Del. & Hudson Co.*, 213 U. S. 366; *White* v. *Pecos L. & W. Co.*, 18 Tex. Civ. App. 634; *Exchange Bank* v. *Macon Construction Co.*, 97 Georgia, 1; *A., T. & S. F. R. R. Co.* v. *Cochran*, 43 Kansas, 225.

The ownership of the stock of the Galveston, Harrisburg and San Antonio Railway Company and the Terminal Company does not in any manner whatsoever effect an amalgamation of these companies in any legal sense. Each has its own separate corporate organization, and is absolutely independent of the other. In no case has the Interstate Commerce Commission undertaken to stretch its jurisdiction to this extent. Its own decisions are directly against such an assumption of authority. *Cattle Raisers' Assn.* v. *Ft. Worth & Denver Ry. Co.*, 7 I. C. C. Rep. 513; *Kentucky & Indiana Bridge Co.* v. *L. & N. R. R. Co.*, 37 Fed. Rep. 567; *Cotting* v. *Kansas City Stock Yards Co.*, 82 Fed. Rep. 839.

The lease contract held to be unlawful does not, under the facts proven, constitute an unlawful or undue preference under the Interstate Commerce Act. Young by reason of prompt methods adopted for unloading his traffic, and by reason of the warehousing facilities with which he has provided himself, is able to unload the product within the ten days, and hence does not incur the penalties of demurrage charges; not, however, because of any special privilege but because he promptly unloads

his products. The record discloses no fact which would justify the conclusion that any party has been subjected to any undue or unfair advantage by reason of this lease contract. A common carrier has the right to lease or sell property which it owns in fee for the erection of warehouses, elevators, etc., and it is so universal a business method all over the United States that the court may take judicial knowledge thereof. The decision of the Interstate Commerce Commission in this case will revolutionize industrial methods in this country. *Stock Yards Co.* v. *L. & N. R. R. Co.*, 67 Fed. Rep. 35; *Ilwaco Ry. Co.* v. *Oregon Short Line & U. N. Ry. Co.*, 57 Fed. Rep. 673.

The order of the Commission transcends its jurisdiction, in that it regulates commerce purely state and intrastate, and also purely foreign commerce, neither of which is subject to its authority. *G., C. & S. F. Ry. Co.* v. *Texas*, 204 U. S. 403; *Augusta Brokerage Co.* v. *Central of Georgia Ry. Co.*, 5 Ga. App. Rep. 187; *Cosmopolitan Shipping Co.* v. *Hamburg-American Packet Co.*, 13 I. C. C. Rep. 266, 279. The greater part of the traffic is confined to products which move from a point within the State of Texas to a point within the same State upon a local bill. This is intrastate and domestic traffic. When it leaves the warehouse of Young it goes without the interposition of any common carrier into the hold of a ship direct to Europe. Over this transit the Interstate Commerce Commission has no jurisdiction.

*Mr. Wade H. Ellis* and *Mr. Luther M. Walter* for appellee, the Interstate Commerce Commission:

The appeal should be dismissed because the Commission's order has expired and the case is now moot. *Mills* v. *Green*, 159 U. S. 651; *Pennsylvania* v. *Wheeling & Bel. Bridge Co.*, 18 How. 421; *San Mateo County* v. *Southern Pac. Co.*, 116 U. S. 138; *Little* v. *Bowers*, 134 U. S. 547; *California* v. *San Pablo & Tulare R. R. Co.*, 149 U. S. 308;

*New Orleans Flour Inspectors* v. *Glover,* 160 U. S. 170;
*Dinsmore* v. *Southern Exp. Co. and Georgia R. R. Comm.,*
183 U. S. 115; *Jones* v. *Montague,* 194 U. S. 147; *Richard-
son* v. *McChesney,* 218 U. S. 487.

On the merits this case involves three propositions:
1. Whether the Southern Pacific Terminal Company is
subject to the act to regulate interstate commerce;
2. Whether the order of the Commission relating to ship-
ments originating both within and without the State of
Texas but intended for trans-shipment abroad is a regula-
tion within the jurisdiction of the Commission, and
3. Whether the contract with Young constitutes an un-
due preference within the meaning of the act to regulate
commerce.

The Terminal Company is subject to the act to regu-
late commerce because it is engaged in the business of
furnishing facilities for the Southern Pacific Railroad and
Steamship System and its terminal charges are included
in the tariffs published by the railroads with which it
connects and for which it furnishes terminals.  Any fair
construction of the Interstate Commerce Act would lead
to the conclusion that the Terminal Company is within
the terms of the act which by its express language applies
to terminal facilities of every kind used or necessary in
the transportation or delivery of property.  If terminal
facilities such as those maintained by the Southern Pa-
cific Terminal Company are not included within the
terms of the act then evasion of the provisions of the act
so far as they relate to any terminal facilities is possible
by every common carrier by the simple expedient of
providing a separate corporation nominally to control
such facilities.  *Eichenberg* v. *So. Pac. Co. et al.,* 14 I. C.
C. Rep. 250, 263.

Without regard to the purpose for which the Terminal
Company was organized the fact remains that it was hold-
ing itself out to the public as furnishing general terminal

facilities for the railroads connecting with it. *Barrington* v. *Commercial Dock Co.*, 15 Washington, 170, 175; *Indian River Steamboat Co.* v. *East Coast Transportation Co.*, 28 Florida, 387; *Missouri Pac. Ry. Co.* v. *Flour Mills Co.*, 211 U. S. 612, 619; *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 418.

*L. & N. R. R. Co.* v. *West Coast Naval Stores Co.*, 198 U. S. 483, is distinguishable, as there was no discrimination between shippers.

The fact that the Terminal Company confines its operations to one State does not affect the question. It is an agency in interstate commerce. *The Daniel Ball*, 10 Wall. 557; *People* v. *Miller*, 178 N. Y. 196.

Not only is the terminal company furnishing terminal facilities for the Southern Pacific System but it is itself an integral part of that system. *Northern Securities Co.* v. *United States*, 193 U. S. 197, 326, 328.

The order of the Commission is a regulation of interstate commerce because the Commission has jurisdiction over all shipments even though part originated within the State of Texas and no advantage can be given to Young that discriminates in his favor and against interstate shippers in the same business. The situation is covered by that class of regulations which the court has described where uniformity is necessary. *Railroad Co.* v. *Fuller*, 17 Wall. 560, 568; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 204; *Missouri Pacific Ry. Co.* v. *Larrabee Mills*, 211 U. S. 611; *Int. Comm. Comm.* v. *Illinois Central R. R. Co.*, 215 U. S. 452; *United States* v. *Colo. & N. W. R. R. Co.*, 157 Fed. Rep. 321, 330.

Even though part of Young's shipments originated within the State of Texas, the business in which he engaged was interstate in character because all the shipments without exception were designed for foreign trade and actually shipped abroad. *Navigation Co.* v. *Insurance Co.*, 32 S. W. Rep. 889.

Even if a portion of Young's shipments are to be considered as not within the provisions of the Interstate Commerce Act the order is not void because the Commission is presumed to have limited its order to the power it had. *Navigation Co.* v. *Campbell*, 177 Fed. Rep. 318.

That it did not point out in detail the manner in which discriminations should be remedied, does not make the order void. *N. Y. Cent. & H. R. R. R. Co.* v. *Int. Comm. Comm.*, 168 Fed. Rep. 131.

The contract with Young constitutes an undue preference within the meaning of the act. See §§ 2, 3, 6, and 15.

The act should be liberally construed so as to advance the remedy and retard the wrong. *N. Y., N. H. & H. R. R. Co.* v. *Int. Comm. Comm.*, 200 U. S. 361; *American Express Co.* v. *United States*, 212 U. S. 522, 532.

Every shipper using the terminal facilities was required to pay a certain wharfage charge according to a fixed schedule as well as storage charges. Young was granted the right to use the terminal facilities free of wharfage charges and storage charges for the lump sum of $15,000 per year, whereas if he had paid the regular charges the cost would have been $42,000 per year. Such an agreement clearly constitutes discrimination in favor of Young. Contracts between railroad companies and shippers by which for some stated consideration a less charge is made either for facilities furnished or freight carried than is made to other shippers have frequently been passed upon and held to violate statutes against undue preferences. *Hurley* v. *Big Sandy & C. R. R. Co.*, 125 S. W. Rep. 302; *C. & O. R. R. Co.* v. *Standard Lumber Co.*, 174 Fed. Rep. 107; *Hobart-Lee Tie Co.* v. *Stone*, 117 S. W. Rep. 604; *Chicago & Alton R. R. Co.* v. *United States*, 156 Fed. Rep. 558. That the Terminal Company had power to lease its property or alienate its real estate does not affect the question. The vice of the arrangement lies not in the exercise of the power to lease but in

the natural effect of the contract of lease made. *N. Y., N. H. & H. R. R. Co.* v. *Int. Comm. Comm.*, 200 U. S. 361, 397; *Armour Packing Co.* v. *United States*, 209 U. S. 56, 80; *Union Pacific R. R. Co.* v. *Goodrich*, 149 U. S. 680, 691; *Wight* v. *United States*, 167 U. S. 512, 517.

The finding of the Commission that as a matter of fact the contract with Young constituted an undue preference will not be disturbed by this court unless so arbitrary as to transcend the limits of regulation. *Int. Comm. Comm.* v. *Illinois Central R. R. Co.*, 215 U. S. 452; *Illinois Central R. R. Co.* v. *Int. Comm. Comm.*, 206 U. S. 441, 454; *C., N. O. & T. P. R. R. Co.* v. *Int. Comm. Comm.*, 162 U. S. 184, 196; *State* v. *Adams Express Co.*, 85 N. E. Rep. 337; *Int. Comm. Comm.* v. *Alabama Midland Ry. Co.*, 168 U. S. 144, 170.

MR. JUSTICE McKENNA, after stating the facts as above, delivered the opinion of the court.

It will be observed that the order of the Commission required appellants to cease and desist from granting Young the alleged undue preference for a period of not less than two years from September 1, 1908 (subsequently extended to November 15). It is hence contended that the order of the Commission has expired and that the case having thereby become moot, the appeal should be dismissed.

This court has said a number of times that it will only decide actual controversies, and if, pending an appeal, something occurs without any fault of the defendant which renders it impossible, if our decision should be in favor of the plaintiff, to grant him effectual relief, the appeal will be dismissed. *Jones* v. *Montague*, 194 U. S. 147, and *Richardson* v. *McChesney*, decided November 28 of this term, 218 U. S. 487. But in those cases the acts sought to be enjoined had been completely executed, and

there was nothing that the judgment of the court, if the suits had been entertained, could have affected. The case at bar comes within the rule announced in *United States* v. *Trans-Missouri Freight Ass'n*, 166 U. S. 290, 308, and *Boise City Irr. & Land Co.* v. *Clark* (C. C. App. 9th Cir.), 131 Fed. Rep. 415.

In the case at bar the order of the Commission may to some extent (the exact extent it is unnecessary to define) be the basis of further proceedings. But there is a broader consideration. The questions involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar) and their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review, and at one time the Government and at another time the carriers have their rights determined by the Commission without a chance of redress.

In *United States* v. *Trans-Missouri Freight Ass'n, supra,* the object of the suit was to obtain the judgment of the court on the legality of an agreement between railroads, alleged to be in violation of the Sherman law. In the case at bar the object of the suit is to have declared illegal an order of the Interstate Commerce Commission. In that case there was an attempt to defeat the purposes of the suit by a voluntary dissolution of the agreement, and of the attempt the court said: "The mere dissolution of the association is not the most important object of this litigation. The judgment of the court is sought upon the question of the legality of the agreement itself, for the carrying out of which the association was formed, and if such agreement be declared to be illegal the court is asked not only to dissolve the association named in the bill, but that the defendant should be enjoined for the future. . . . Private parties may settle their controversies at any time, and rights which a plaintiff may have had at the time of the commencement of the action may terminate before

judgment is obtained, or while the case is on appeal, and in any such case the court, being informed of the facts, will proceed no further in the action. Here, however, there has been no extinguishment of the rights (whatever they are) of the public, the enforcement of which the Government has endeavored to procure by the judgment of a court under the provisions of the act of Congress above cited. The defendants cannot foreclose those rights nor prevent the assertion thereof by the Government as a substantial trustee for the public under the act of Congress, by any such action as has been taken in this case." Referring to the agreement as one claimed by the Government as illegal, it was further said (p. 310): "That question the Government has the right to bring before the court and obtain its judgment thereon." The interests there passed upon are no more of a public character than those involved in the order of the Interstate Commerce Commission in the case at bar, and there was no greater necessity for continuing a jurisdiction which had properly attached, and that the Government is the respondent, not complainant, does not lessen or change the character of the interests involved in the controversy or terminate its questions.

In *Boise City Irr. & Land Co.* v. *Clark, supra,* the period for which a municipal ordinance fixed a water rate expired pending the litigation as to its legality, and it was contended that the case had become moot. The court replied: "But the courts have entertained and decided such cases heretofore, partly because the rate, once fixed, continues in force until changed as provided by law, and partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the municipal body when again called upon to act in the matter."

The motion to dismiss is denied.

Four errors are assigned in the action of the Circuit

Court in dismissing the bill of complaint. (1) The Interstate Commerce Commission had no jurisdiction over the Terminal Company, it not being a common carrier, and therefore not subject to the act to regulate commerce. (2) The Commission had no power or authority to declare the lease to Young illegal. (3) The lease does not constitute an unlawful or undue preference or advantage within the meaning of the act. to regulate commerce. (4) The Commission by its order assumed to control intrastate and foreign commerce, not subject to the act to regulate commerce.

Two facts are prominent in the case, that the piers of the Terminal Company are facilities of import and export traffic at the port of Galveston and that the arrangement of the Terminal Company with Young has enabled him to largely and rapidly increase his business until his exports of cotton seed products are more than twice those of all other competitors, that he derives therefrom 30 to 40 cents per ton over the ordinary buying and selling profit, and that some who were his competitors have ceased to export. A direct advantage to Young is manifest. A direct detriment to other exporters is equally manifest.

The situation challenges attention. Appellants find in it nothing but the natural and legal result of the sagacity which could see an opportunity for profit and the enterprise which could avail of it. It was the simple matter on the part of Young, it is contended, of bringing his business to the ship's side and cutting out intervening expenses. And it is said that the Terminal Company had an equally lawful inducement. It had an idle property, it is contended, over which it had absolute control and which it turned to use and profit by the arrangement with Young. And this, it is insisted, was a simple exercise of ownership. If the elements of the controversy are correctly stated, the justification may be considered as made out.

Appellants make much of their title and, assuming it to be absolute, assert the right to an unrestrained use of the property. But the assertion overlooks or underestimates the condition expressed in the deed to Huntington, that from his estate to the Terminal Company, in the ordinance of the city of Galveston, and in the act of the legislature of the State of Texas. The condition expressed in all of them was that terminal facilities should be constructed upon the property for the use of the Southern Pacific Railroad and Steamship Systems. The act of the legislature declared that the property "should be developed for shipping and transportation purposes, and that the shipping facilities at the port of Galveston should be thereby improved and enlarged in order to better accommodate the commerce of the port and of the State." And wharfage charges, except so far as they should be covered by the freight rates, should be subject to regulation by the railroad commission of the State.

It is clear, therefore, that it was the purpose of the ordinance and of the act confirming it to secure shipping facilities for the city, open to public use, and necessarily so, for the property was to be the terminal of a railroad and steamship system. It may be, as it is contended, that there was no necessity for the ordinance, "except for the purpose of a valid relinquishment of the municipal right, often asserted by it, of opening streets through the bay front property and constructing wharves thereon." The relinquishment was treated as valuable and Huntington pledged the property to a public use as a consideration for it. And, as we have said, such use was also a condition expressed in the act of the legislature. It was not discharged by the expenditure of $150,000 and the erection of wharves by Huntington, as seems to be the contention.

The case has no likeness whatever to *Louisville &c. R. R. Co.* v. *West Coast Co.,* 198 U. S. 483. In the latter case there was no discrimination against the West Coast Com-

pany by the railroad company or a preference given to any person. The West Coast Company had the same privilege of using the wharves of the railroad company as other shippers were given. It asserted other privileges. It asserted the privilege of using the wharf for the purpose of transferring goods into vessels which it might arrange to take them; in other words, not into the vessels of the railroad company or into those with which it had traffic agreements. And we said, through Mr. Justice Peckham, "In brief, the fact seems to be that the only complaint of the plaintiff (West Coast Company) is that the defendant (the railroad company) will not permit competing vessels to make use of its wharf for the purpose of such competition."

It is true that there was a contention that the wharf was a public one, but the contention was based only on the fact that the wharf was built at the foot of a public street by authority from the city of Pensaçola and the State of Florida. That fact alone was not considered sufficient to support the contention. And it was said, "The city or State authorities in granting the right to erect such facilities might, of course, have attached such conditions as they thought wise, but in their absence neither the public nor this plaintiff, as the owner of goods, would have the right, on this state of facts, to go to the wharf with vessels for the purpose of continuing transportation of goods in competition with defendant." It is true it was said that the railroad company never became a common carrier as to the wharf, in the sense that it was bound to accord to the public or to the West Coast Company the right to use it upon payment of compensation. But it was added that the railroad company would be bound to carry the West Coast Company's goods on the rails which led to the wharf, for the same purpose and upon the same terms that it did for others, viz., in order that it might itself, or through others it had contracted with, forward

the goods beyond its own line. And it was further said
that the West Coast Company demanded more than this;
it demanded that the railroad company should carry its
goods in order that it might itself forward them by ves-
sels of its own selection, and that the railroad company
should surrender possession of enough of its wharf to en-
able the other company to do so.

Nor is *Weems Steamboat Company* v. *People's Company*,
214 U. S. 344, applicable to the pending controversy. The
contest there was between two independent lines of
steamboats, the one claiming a right to use the wharves
of the other, on the ground that the wharves had been
dedicated to the public. The fact was found adversely to
the contention, and the claim of right to the use of the
wharves denied. A review of the reasoning of the court is
unnecessary. There is great difference between compet-
ing carriers claiming the right to use the facilities of one
another and the patrons of the same carrier contending
for equality of treatment. In stating this we assume that
the wharves in the pending case are the instruments of a
common carrier. This is, however, denied, and it is as-
serted that the Terminal Company is purely a wharfage
company, and "has no power under its charter to act as
a common carrier." The contention is based on a partial
view of the conditions. The Terminal Company was in-
corporated to execute the purposes expressed in the act of
the legislature of the State of Texas, that is, to construct
terminal facilities for the Southern Pacific Railroad and
Steamship Systems, and to accommodate the export and
import traffic at Galveston; and, necessarily, as instru-
mentalities of such traffic, wharves and piers are as es-
sential as steamships and railroads, and are, in fact, as
they were intended to be by the charter of their authoriza-
tion, parts of a system. The only track facilities for
movement of cars to or from the ships, from or to the
tracks of the Southern Pacific Railways, are on the Termi-

nal Company's lands, and are owned by it. To these tracks the Galveston, Harrisburg and San Antonio Railway switches cars for other railroads, charging $1.75 per car, and the Terminal Company receives a trackage charge of 50 cents per car. It is true that the Terminal Company does a wharfage business and publishes a schedule of its charges, which, while not filed with the Interstate Commerce Commission, shows a charge of 20 cents a ton on cotton seed cake and meal, and this appears as a wharfage charge in the tariffs of the Galveston, Harrisburg and San Antonio Railway Company and other railways entering the city of Galveston. And, besides, the Terminal Company was a party to numerous circulars issued by the Southern Pacific Railway Company, and that effective May 23, 1905, was filed with the Interstate Commerce Commission. These circulars gave terminal charges at the port of Galveston. The charge on cotton seed meal and cake was given at 1 cent per 100 pounds. Shipments on through bills of lading include in the freight rate the wharfage charge.

Another and important fact is the control of the properties by the Southern Pacific Company through stock ownership. There is a separation of the companies if we regard only their charters; there is a union of them if we regard their control and operation through the Southern Pacific Company. This control and operation are the important facts to shippers. It is of no consequence that by mere charter declaration the Terminal Company is a wharfage company or the Southern Pacific a holding company. Verbal declarations cannot alter the facts. The control and operation of the Southern Pacific Company of the railroads and the Terminal Company have united them into a system of which all are necessary parts, the Terminal Company as well as the railroad companies. As said by the Interstate Commerce Commission, "the Terminal Company was organized to furnish terminal

facilities for the system at the port of Galveston," and it is further said that "through shipments on the railroad lines from and to points in different States of the Union pass and repass over the docks of the Terminal Company. It forms a link in this chain of transportation. It is nec- essary to complete the avenue through which move ship- ments over these lines owned by a single corporation." And this unity of the railroad's lines and the terminal facilities is recognized in the lease to Young. By it he, agrees to route all of his shipments over "the lines of the Terminal Company and its connections, according to the instructions of said Terminal Company from time to time." And provision is made against the possibility of other lines bidding for the traffic by lower rates. In such event he must give notice to the Terminal Company and give it "the option of meeting such proposed rates," and if the company "elects to do so," then he "shall not divert such shipments, but shall abide by the provisions" of his agreement. And surely a system so constituted and used as an instrument of interstate commerce may not escape regulation as such because one of its constituents is a wharfage company and its dominating power a holding company. As well said by the Interstate Commerce Commission, "a corporation such as this Terminal Com- pany, which has 'competing lines,' should not be per- mitted to defeat the jurisdiction of this Commission by showing that it is not in fact owned by any railroad com- pany. . . . The Terminal Company is part and parcel of the system engaged in the transportation of commerce, and to the extent that such commerce is interstate the Commission has jurisdiction to supervise and control it within statutory limits. To hold otherwise would in effect permit carriers generally, through the organization of sepa- rate corporations, to exempt all of their terminals from our regulating authority."

The reasoning of the Commission is justified by the

statute. It includes in the term "railroad" "all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease, and shall also include all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, and also all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property."

The property of the Terminal Company is "necessary in the transportation or delivery" of the interstate and foreign freight transported by the lines of the Southern Pacific system. It is the only terminal for freight moving over the lines of such system, the rails of one of those lines, the Galveston, Harrisburg and San Antonio Railway Company, connecting with tracks upon the docks of the Terminal Company. That the latter collects a trackage charge from the former and it a switching charge from the Terminal Company are, to quote the Commission, "but incidents of the separate corporations."

In opposition to these views appellants urge the legal individuality of the different railroads and the Terminal Company and cite cases which establish, it is contended, that stock ownership simply or through a holding company does not identify them. We are not concerned to combat the proposition. The record does not present a case of stock ownership merely or of a holding company which was content to hold. It presents a case, as we have already said, of one actively managing and uniting the railroads and the Terminal Company into an organized system. And it is with the system that the law must deal, not with its elements. Such elements may, indeed, be regarded from some standpoints as legal entities; may have, in a sense, separate corporate operation; but they are directed by the same paramount and combining power and

made single by it. In all transactions it is treated as single. . In the ordinance of the city of Galveston, in the act. of 1899, of the legislature of the State, and in public circulars and in the lease of Young, it is the system which is dealt with and not its separate links. And, we have seen, the terminal facilities which the Terminal Company was authorized to maintain were for the system, not for the corporate elements considered separately.

It is next contended that the lease to Young under the facts proven does not constitute an unlawful or undue preference under the Interstate Commerce Act.

To a certain extent we have considered this contention. An absolute advantage to Young cannot be denied. A facility that has enabled him to acquire practically all the export of cotton seed products must have something in it of advantage which other shippers do not receive, and it would seem to proclaim a power working for his benefit which is not working for others. And yet it is urged that there is a contrariety of opinion about it among cotton seed cake producers, and as to whether Young is able to dominate the Texas market and to command the foreign trade. The facts, we think, put the matter beyond conjecture or opinion and demonstrate the potency of his situation. That it is a preference, however, is denied; and it is urged that by the agreed statement of facts all cotton seed cake producers "agree that if there was a general establishment of plants in Galveston, so that a monopoly could not be acquired" by Young, "it would be of great benefit to the cotton seed industry." But it is also agreed that neither the Galveston Wharf Company nor the Terminal Company has space enough to afford facilities to "all exporters doing business at Galveston" such as Young. And the Commission found that as a practical matter other shippers could not be given the same facilities on the same conditions as those granted to him, nor could such fa-

cilities be secured on the bay front. It was further found that the Terminal Company had indicated that it is not willing to accord shippers generally such facilities, and that the situation of its docks with respect to space is such that it cannot do so even if it were willing. It may be contended that the patrons of a railroad are not obliged to seek or compete for extraordinary facilities in its terminals. But, be that as it may, all shippers must be treated alike.

Appellants bring forward the same argument to support the contention under consideration which they advance to support their first contention, to wit, the right, as owner of the property, to make a lease of its "unused property," subject only to the limitation that there shall be no interference "with the use of the adjacent navigable waters." It would seem that, if the argument have any force at all, it would extend the rights of ownership to used as well as unused property and be exercised in any form of preference, even to the exclusion of some shippers from the wharves. However, as appellants do not press the argument so far we need not dwell upon it and will only add that the terminal facilities contemplated by the ordinance of the city of Galveston and the act of the legislature of Texas confirming it were public terminal facilities, not those which might be granted or withheld in preferences or discriminations.

The last contention advanced is that "the order of the Commission transcends its jurisdiction, in that it regulates commerce purely State and intrastate, and also purely foreign commerce, neither of which is subject to its authority."

In support of this contention it is insisted that the evidence shows the following facts: The cake and meal purchased by Young are bought by him in Texas, Oklahoma, Louisiana and Arkansas, but chiefly in Texas, and shipped to him on bills of lading and way bills, showing

the point of origin in those States and the destination at Galveston. The purchases are made for export, there being no consumption of the products at Galveston. His sales to foreign countries are sometimes for immediate and sometimes for future delivery, irrespective of whether he has the product on hand at Galveston. At times he has it on hand. At times, therefore, orders must be filled from cake to be purchased in the interior or then in transit to him. When the cake reaches Galveston it is ground into meal and sacked by Young, and for the meal thus ground and such meal as has been brought to his customers he takes out ships' bills of lading made to his order.

This evidence establishes, appellants contend, that the transit of the cake and meal is absolutely ended at the leased premises at Galveston, and that it is "a final point of concentration and manufacture, the cotton seed cake being there manufactured into meal and sacked for export." But this does not distinguish between the meal and the cake, nor between the meal that is purchased at points outside of Texas and directly exported, from that so purchased and manufactured on the wharves of the Terminal Company. Nor does it take account of the fact that the wharves were intended for shipping facilities, a means of transition from land carriage to water carriage. It is manifest, as we have said, that to make the wharves manufacturing or concentrating points for one shipper and not for all is to give that shipper a preference. And, being a preference, the traffic necessarily comes under the jurisdiction of the Interstate Commerce Commission. In other words, the manufacture or concentration on the wharves of the Terminal Company are but incidents, under the circumstances presented by the record, in the trans-shipment of the products in export trade and their regulation is within the power of the Interstate Commerce Commission. To hold otherwise

would be to disregard, as the Commission said, the substance of things and make evasions of the act of Congress quite easy. It makes no difference, therefore, that the shipments of the products were not made on through bills of lading or whether their initial point was Galveston or some other place in Texas. They were all destined for export and by their delivery to the Galveston, Harrisburg and San Antonio Railway they must be considered as having been delivered to a carrier for transportation to their foreign destination, the Terminal Company being a part of the railway for such purpose. The case, therefore, comes under *Coe* v. *Errol*, 116 U. S. 517, where it is said that goods are in interstate, and necessarily as well in foreign, commerce when they have "actually started in the course of transportation to another State, or delivered to a carrier for transportation." In *G., C. & S. F. Ry. Co.* v. *State of Texas*, 204 U. S. 403, the facts are different and the case is not apposite.

*Decree affirmed.*