## CEDAR–RIVERSIDE ENVIRONMENTAL DEFENSE FUND et al., Plaintiffs-Appellees,

### v.

### Carla A. HILLS et al., Defendants-Appellants.

### Nos. 76–1452, 76–1576.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1977.

Decided Aug. 8, 1977.

Anthony J. Steinmeyer, Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for appellant, Secretary of Housing and Urban Development.

Wayne G. Popham, Minneapolis, Minn., for appellant, Cedar-Riverside Associates.

---

John H. Herman, Minneapolis, Minn., for appellee, Cedar-Riverside Environmental Defense Fund.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Robert G. Renner, U. S. Atty., Minneapolis, Minn., and Morton Hollander and Anthony J. Steinmeyer, Attys., Appellate Sec., Civil Div., Dept. of Justice, Washington, D. C., on brief for Federal appellants.

Raymond A. Haik and Allen W. Hinderaker, Attys., Minneapolis, Minn., on brief for Cedar-Riverside Associates.

Roger A. Peterson, Minneapolis, Minn., on brief for The Minneapolis Building and Construction Trades Council, as amicus curiae.

Trudy McFall, St. Paul, Minn., on brief for The Minnesota Chapter, American Institute of Planners.

Timothy W. Regan, Minneapolis, Minn., on brief for Model Cities Planning Council and Model Cities Policy Board, appellees.

John H. Herman and James A. Payne, Minneapolis, Minn., on brief for appellees.

Barbara Allen Babcock, Acting Asst. Atty. Gen., Washington, D. C., Robert G. Renner, U. S. Atty., Minneapolis, Minn., Morton Hollander and Anthony J. Steinmeyer, Attys., Appellate Sec., Civil Div., Dept. of Justice, Washington, D. C., on brief for the Federal appellants.

Before BRIGHT and ROSS, Circuit Judges, and URBOM,* Chief District Judge.

PER CURIAM.

This is an appeal from an order of the district court permanently enjoining further construction on the housing project in Minneapolis, Minnesota, designated as the "Cedar-Riverside New Town in Town."

* The Honorable Warren K. Urbom, Chief Judge of the United States District Court for the District of Nebraska, sitting by designation.

1. The Cedar-Riverside Urban Renewal Area contains approximately 336 acres of land bounded by Interstate 94 on the south, Interstate 35 on the west, and the Mississippi River on the north and east. The area is located

The district court found the defendants in substantial noncompliance with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, the Minnesota Environmental Policy Act (MEPA), Minn.Stat. Ann. §§ 116D.01 *et seq.*, and the Minnesota Environmental Rights Act, Minn.Stat.Ann. §§ 116B.01 *et seq. Cedar-Riverside Environmental Defense Fund v. Hills*, 422 F.Supp. 294 (D.Minn.1976). Because we find the dispute to be no longer "alive" for purposes of the Article III case or controversy requirement, we dismiss the case as moot and order the injunction dissolved.

This appeal arises in a peculiar context. We proceed to outline the pertinent developments which have brought the case into its current posture.

In 1968, after years of study indicated that the Cedar-Riverside area of Minneapolis was in a state of urban decay and in need of urban renewal, the Minneapolis Housing and Redevelopment Authority (MHRA) submitted the Cedar-Riverside Urban Renewal Plan to the Minneapolis City Council which, in turn, approved the Plan.[1] The Plan contemplated high density residential development and concomitant commercial development in order to accommodate the educational and institutional character of the area. In 1970, the defendant Cedar-Riverside Associates, Inc., was selected by the MHRA as the private developer for 100 acres of private, noninstitutional land within the Urban Renewal Area. At that time the Development Plan contemplated a ten stage residential and commercial development between 1972 and 1991, which would provide approximately 12,500 dwelling units and 2,500,000 square feet of commercial/cultural space. The population of the area at project maturity was projected between 25,000 and 30,000 people.[2] In

between downtown Minneapolis and the University of Minnesota.

2. Stage I of the project, involving approximately 1,300 dwelling units, was completed before this litigation was commenced. Stage II, which is the immediate concern of all the parties, contemplated construction of high-rise apartment buildings on three sites. Stages IIA and IIB were to have approximately 1,650 dwelling

1971, the United States Department of Housing and Urban Development (HUD) guaranteed $24 million of the developer's obligations pursuant to Title VII of the Housing and Urban Development Act of 1970, 42 U.S.C. §§ 4501 *et seq.*

On December 13, 1973, the plaintiffs brought this action alleging, *inter alia,* noncompliance with NEPA, MEPA and the Minnesota Environmental Rights Act. Because its financial involvement constituted a major federal action significantly affecting the quality of the human environment under NEPA, HUD agreed, on March 22, 1974, to prepare an environmental impact statement (EIS) on Stage II and the project at maturity. This lawsuit was held in abeyance pending the filing of the EIS. The draft EIS was circulated for public comment on October 15, 1974. On February 10, 1975, after the appropriate comment period had run, the final EIS was published. HUD thereupon submitted the EIS to the Council on Environmental Quality (CEQ) for purposes of NEPA, and the MHRA transmitted the EIS to the Minnesota Environmental Quality Council for purposes of MEPA.

The plaintiffs' action then took the form of an attack on the adequacy of the EIS. On March 29, 1976, after a lengthy trial before a master, the district court found that the EIS was inadequate in many respects under NEPA, MEPA and the Minnesota Environmental Rights Act and enjoined the future development. HUD and the private developer thereupon took this timely appeal.

Financial difficulties have plagued the private developer throughout the history of this project. In 1975, the developer defaulted on its Stage I mortgages and its New Community loan. Although the parties attribute different reasons for the developer's financial difficulties, one point remains clear: substantial land cost writedowns or other debt forgiveness is an essential prerequisite for any future development of the area.

After the appeal was docketed in this court, several significant developments occurred. On the federal front, the New Community Development Corporation within HUD adopted a resolution on December 10, 1976, concerning the acquisition and disposition of the Cedar-Riverside New Town in Town. The resolution discussed a report prepared by a Coopers & Lybrand consultant, team which proposed continuation of the development, including the construction of a minimum of 5,000 new and 200 rehabilitated units, with HUD acquiring the project property by a deed in lieu of foreclosure or by foreclosure. The resolution authorized and directed the Deputy General Manager of HUD to determine whether this alternative was acceptable to the local parties and the City of Minneapolis. The resolution further authorized and directed the Deputy General Manager to " * * * take such steps as are necessary for the termination and orderly liquidation of the project * * * " if the local parties failed to indicate acceptance of the alternative.

Viewing this resolution as a substantial departure from the defendants' theretofore expressed intention of building a 12,500 dwelling unit development, the plaintiffs, on January 4, 1977, moved for an order declaring the action moot. On May 9, 1977, after the merits of the case had been submitted on briefs and oral argument, we ordered the parties to file sworn affidavits and supplemental briefs on whether, in view of the December 1976 resolution and subsequent developments, the case had been rendered moot. In response to our order, William White, General Manager of the New Community Development Corporation, stated that the 5,000 dwelling unit figure mentioned in the December 1976 resolution was merely a minimum density level set for purposes of negotiating an expeditious end to this litigation. White also stated:

It is the view of the Department that * * * the construction of the Cedar-

units housing approximately 3,300 people and occupying 14.5 acres in the Riverbluff Area. Stage IIC was to have 129 dwelling units for

the elderly on 1.03 acres in the western part of the development.

Riverside New Town in Town at the density levels originally specified is viable with the current developer or a replacement developer. Assuming private and public sources of revenues to finance development and construction, a project could be economically viable at any number of density levels including the original level proposed. The project becomes more economically viable as densities and therefore per-unit sales proceeds increase. My present intention is to recommend to the New Communities Development Corporation Board that given a density of development satisfactory to them as a new town, that they should approve some level of federal financing to insure the continuation of the project rather than its liquidation.

The private developer also indicated its intention to proceed with the project. Robert Jorvig, president and chief executive officer of Cedar-Riverside Associates, Inc., stated: "Even though CRA has sustained large losses as a result of the delay attendant to the lawsuit, CRA itself definitely proposes to proceed with the project if the litigation is concluded in the foreseeable future."

Given White's express intent to request the necessary financing for the project and the developer's intent to proceed, we would have little doubt that the December 1976 resolution, in and of itself, did not moot the case. However, matters have been considerably complicated by actions taken by the various local agencies since February 16, 1977. On that date, a unanimous resolution of the Minneapolis City Council was approved by the Mayor of Minneapolis establishing the Cedar-Riverside Task Force. The Task Force was charged with the following responsibilities:

1. To develop and recommend a plan for the redevelopment and rehabilitation of the Cedar-Riverside area, including suggested land use, population density, housing types, transportation systems, and commercial space;

2. To develop and recommend a strategy for implementing said proposed plan including funding mechanisms and legislation, if any, for obtaining said funds; and

3. To solicit recommendations from all interested parties.

After studying the area, the Task Force proposed a residential development in Cedar-Riverside of 1,900 new apartment units and 450 rehabilitated apartment units. The Task Force also proposed that Stage II should contain approximately 500 new units and 206 existing units. Certain design and site changes were recommended by the Task Force particularly with respect to Stage II. These include residential development away from the face of the river bluff in order to preserve its natural state; and the construction of low-rise nonelevator walk-up apartments in several of the subareas in order to meet the housing demands of families with children. In addition, the Task Force recommended that the Cedar-Riverside area not be developed as a regional retail commercial center serving a wide geographic area, that commercial spaces be rehabilitated where possible and that new commercial construction be low-rise in character.

The Task Force proposal is a substantial departure from the Cedar-Riverside New Town contemplated in the 1968 Urban Renewal Plan and proposed in the EIS. If the Task Force Report is implemented, the projected densities in the Cedar-Riverside area at project maturity will be reduced from 12,500 dwelling units, the number permitted under the 1968 Urban Renewal Plan and proposed in the EIS, to 1,900 new dwelling units, 450 rehabilitated units and 2,113 existing units. With respect to Stage II, the densities will be reduced from 1,800 units to 706 units (500 new units and 206 existing units). In addition, the Task Force proposes substantial changes in building design, building location and commercial development.

The Task Force submitted its Report to the Minneapolis Housing and Redevelopment Authority (MHRA) and the City Council on May 2, 1977. The MHRA unanimously adopted the land use recommendations on May 19, 1977. At the Minneapolis

City Council meeting on May 27, 1977, the Council formally adopted the Task Force Report by a vote of 8 to 5. The Council directed the MHRA to begin the preparation of all necessary documents to implement a change in the 1968 Urban Renewal Plan for Cedar-Riverside. On June 24, 1977, the Council amended its action of May 27 in adopting the Task Force Report by deleting all reference to proposed densities. However, on June 29, 1977, the Mayor of Minneapolis vetoed this action. On July 15, 1977, the Council reembraced the Task Force Report as the official Council position on the matter.

On June 9, 1977, we remanded the case to the district court for additional proof and recommendations on the question of mootness. Hearings were held by the district court on June 23, 1977, and on July 8, 1977. On July 12, 1977, the district court made its findings of fact and conclusions of law which include the following conclusions:

1. This Court now concludes that for the Court of Appeals to go forward and to have to make any judgment with reference to the matter now pending before them, would be to make a judgment in a vacuum about a fantasy; that there is no plan to go forward with the plan which was studied by the Master in this case; that there is no genuine probability that any contemplated plan will even approach the densities that were thereupon contemplated; that the developer may or may not be the same one; that the development may be made by people who radically differ with the Cedar-Riverside Associates; that the problem of Federal funding is as far off now as it was on the first day when this hearing was held when the Court asked the Manager of Cedar-Riverside if he had any financially feasible way he could proceed and he, in effect, admitted that the further they went on their plan the more insolvent they would become. Given these circumstances, this Court recommends that the Eighth Circuit find the matter moot.

2. An opinion as to the adequacy of this EIS, after HUD has already indicated it will undertake further environ- mental reviews, in view of the nebulousness of present action on the project, the obvious material changes that the new planning has wrought and the financial infeasibility of any development, would be purely advisory. Of course, information therein which is valid and reliable can and should be used in any future Cedar-Riverside EIS on any new Stage II application or on the revised plan for the area. This should allow a material shortening of the EIS review time in the future.

At the hearing on July 8, 1977, HUD offered in evidence the funding agreement entered into in 1973 by the city of Minneapolis and the United States. Although HUD pointed out that under the contract no change in the Urban Renewal Plan could be made by the City without the concurrence of HUD, it did not indicate that HUD contemplated any attempt to enforce the agreement as written. Indeed, such action by HUD would not be wise nor practical at this stage of the matter, especially in view of the present official position of the Minneapolis City Council.

■ Federal courts are of course without power to decide questions that cannot affect the rights of litigants in the case before them. *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971); *DeFunis v. Odegaard,* 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). This rule " ' * * * derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.' *Liner v. Jafco,* 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964);" *DeFunis v. Odegaard, supra,* 416 U.S. at 316, 94 S.Ct. at 1706. In order to be justiciable, an actual controversy must exist at stages of appellate review, not simply on the date the action was initiated. *Id.* at 319, 94 S.Ct. 1704.

■ We conclude that the actions of the Minneapolis City Council, the MHRA and the Task Force have mooted the controversy before us. The New Town as proposed

in the 1968 Urban Renewal Plan and EIS cannot go forward without the approval of the City Council. Although the City has not revised its zoning ordinances nor amended the 1968 Plan under which the New Town was conceived, the Council's action in embracing the Task Force Report carries the firm message that whatever is built in Cedar-Riverside will be a substantial departure from the project as originally proposed. Any new development which takes a form similar to that proposed in the Task Force Report will require new and considerably different environmental review than that contained in the EIS before us. Judicial comment on the merits of the EIS would thus be purely an advisory opinion on our part. We recognize that this disposition places HUD in a difficult position with respect to its financing decisions in connection with Cedar-Riverside. This prospect does not justify abrogation of our Article III responsibilities however.

It might be argued that this case involves a question "capable of repetition, yet evading review" and is amenable to federal adjudication despite its mootness under the doctrine of *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Although we cannot foresee the future, we agree that given massive federal financing, a unilateral change of position by the City Council could revive the controversy. However, even in that event, the dispute would not evade expeditious review. The parties would be free to refile this lawsuit. In view of the existence of a voluminous trial and appellate record, an expeditious end to the litigation would be possible, as indicated in the conclusions of the trial court hereinbefore set forth.

Because this case is moot, the judgment below, and its underlying findings and order, are vacated and the case is remanded with directions to dissolve the injunction and dismiss the action. *See United States v. Munsingwear,* 340 U.S. 36, 39, 71 S.Ct. 104, 95 L.Ed. 36 (1950).