HUBBARD et al. v. GALVESTON, H. & S. A. RY. CO. et al.

(Circuit Court of Appeals, Fifth Circuit. October 7, 1912.
Rehearing Denied December 3, 1912.)

No. 2,192.

CORPORATIONS (§ 473*)—ACTION BY BONDHOLDERS—GROUNDS FOR EQUITABLE RELIEF.

After a railroad company had issued bonds secured by a mortgage, it leased its property for a long term to the Southern Pacific Company, which owned all of its stock, and the latter company assumed its liabilities and operated its road as a part of its own system, paying as rental a percentage of its own earnings. Later an agreement was made, and indorsed on the bonds, by which the bondholders, who were also large stockholders of the Southern Pacific Company, agreed to accept in full of the interest each year whatever sum could be paid from the earnings of the mortgagor, after payment of certain expenses and charges for improvements, etc., such sum to be annually determined by the directors. No interest was ever paid thereafter, nor was any sinking fund set aside for payment of the principal as required by the mortgage. The directors annually making a finding that no funds were available therefor, complainants, who owned a large amount, but not a majority, of the bonds, brought suit against the mortgagor and the Southern Pacific Company,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

alleging that the latter, through its stock ownership, wholly controlled the mortgagor, electing its officers and directors, and dictating their action; that it made its own treasurer assistant treasurer of the mortgagor, to whom it caused all net earnings to be transmitted, which were mingled with its own funds and converted to its own use, being in part used in payment of dividends to its stockholders; that for several years such earnings had been sufficient to pay interest on the bonds, if honestly applied, and that the declarations of no funds annually made by the directors were untrue, and in fraud of the rights of the bondholders; that the true condition of the mortgagor could not be ascertained from its books, but from the books of the Southern Pacific Company only; and the bill prayed, inter alia, for discovery and an accounting. *Held* that, whether or not the bondholders' agreement with respect to interest was valid and enforceable, it was a duty which the directors owed to all bondholders in acting thereunder to do so in good faith, and that the allegations of the bill stated a case which entitled complainants to equitable relief.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1854; Dec. Dig. § 473.*]

Appeal from the Circuit Court of the United States for the Western District of Texas; Thomas S. Maxey, Judge.

Suit in equity by Thomas H. Hubbard and others against the Galveston, Harrisburg & San Antonio Railway Company, the Southern Pacific Company, and others. Decree for defendants, and complainants appeal. Reversed.

Thomas H. Franklin, of San Antonio, Tex., and Adrian H. Joline, of New York City, for appellants.

C. L. Bates, of San Antonio, Tex., and James A. Baker, of Houston, Tex., for appellees.

Before PARDEE and SHELBY, Circuit Judges, and FOSTER, District Judge.

FOSTER, District Judge. On March 26, 1907, Thomas H. Hubbard, a citizen of New York, and the Crocker Estate Company, a citizen of California, alleging themselves to be each the owner of upwards of $1,000,000 of the Western Division second mortgage bonds of the last-named defendant, brought their bill in equity against the Union Pacific Railroad, a citizen of Utah, and the Oregon Short Line Railroad Company, a citizen of Oregon, against Frank Storrs, a citizen of New York, and W. P. Hillhouse, a citizen of California, trustees under said mortgage, and against the Southern Pacific Company, a citizen of Kentucky, and the Galveston, Harrisburg & San Antonio Railway Company, a citizen of Texas, hereinafter respectively termed the Pacific Company and the Galveston Company. The allegations and prayer of the bill will be referred to fully hereafter.

The said trustees filed answer and what they termed a cross-bill. The Union Pacific, the Oregon Short Line, and the Pacific Company filed pleas to the jurisdiction. Complainants obtained leave and amended their bill. The pleas of the Union Pacific and the Oregon Short Line were allowed, and that of the Pacific Company was overruled. The Pacific Company and the Galveston Company then filed

special and general demurrers, which were sustained in part, and complainants were allowed to amend.

On April 4, 1910, complainants filed their amended and re-engrossed bill, amplifying and repeating their original allegations.

On May 18, 1910, the Pacific Company and the Galveston Company filed general and special demurrers of the same tenor, numbered from 1 to 14, inclusive, and the court sustained the second and third demurrers of each, going to the whole bill, but did not pass upon the others. The said second demurrers set up that all the bondholders were necessary parties to the bill, and the third that the bill was without equity.

Complainants were again allowed to amend, and on September 5, 1910, they filed extensive amendments, correcting numerous clerical errors, and adding many paragraphs to their bill, and alleging the Pacific Company to be the holder of $1,100,000 of said bonds, and Henry E. Huntington, a citizen of California, Arabella D. Huntington, a citizen of New York, and Leland Stanford, Jr., University, a citizen of California, to be the holders of the balance of said second mortgage bonds, issued and outstanding, not held by the complainants or the Pacific Company, and prayed that they be made parties to the suit, if deemed necessary by the court.

On November 7, 1910, the Galveston Company and the Pacific Company filed general and special demurrers to the re-engrossed bill as amended, numbered from 1 to 21, inclusive, of identical tenor, and on January 3, 1911, the Galveston Company filed four additional special demurrers. On January 16, 1911, complainants having declined to further amend, the court entered a decree sustaining demurrers 3 and 7 of both defendants, filed May 18, 1910, demurrer 16 of the Pacific Company, filed the same date, and demurrers 1, 4, 5, 7, to 18, inclusive, and 20 and 21 of both defendants, filed November 7, 1910, and dismissed the bill. Demurrers 1, 2, 3, and 4 of both defendants, filed May 18, 1910, go to the whole bill. All the other demurrers are to either specified paragraphs or to unidentified parts of the bill. On the same day the motion of both defendants to strike from the files the cross-bill of Storrs and Hillhouse, trustees, was sustained.

From the decree and order complainants have appealed, and assign as errors the striking of the cross-bill and the sustaining of the said demurrers.

In this matter the pleader seems to have proceeded upon the time-honored theory that a good case should not be allowed to fall for lack of sufficient allegation, for the re-engrossed and amended bill is voluminous, covering some 87 pages of the printed record, and the cause of action could have been more briefly and succinctly stated. But no doubt this is in part due to the repeated demurrers filed, and the defendants, perhaps, might also be charged with prolixity.

Complainants, by their re-engrossed bill as amended, allege the following facts:

In 1850 the Buffalo Bayou, Brazos & Colorado Railroad Company was incorporated by the Legislature of Texas to operate a railroad

from Buffalo Bayou to the Brazos river. It was sold out under foreclosure, and in 1870, by act of the Texas Legislature, its name was changed to the Galveston, Harrisburg & San Antonio Railway Company, and it was authorized to extend its line from San Antonio west to the Rio Grande, and to borrow money and issue bonds. Collis P. Huntington, Leland Stanford, Charles Crocker, and Mark Hopkins, all now deceased, had acquired practically all of the stock of the Galveston Company and of certain other railroads, which together now comprise the Southern Pacific System and form a continuous line across the continent from San Francisco to New Orleans, and were operating them practically as one road. On July 1, 1881, the Galveston Company issued $6,709,000 of bonds, maturing in 50 years, with interest at 6 per cent., payable semiannually on January 1st and July 1st, and $6,354,000 of them were sold and the proceeds used in further building and equipping its line from San Antonio to El Paso and to Eagle Pass, called the Western Division. A deed of trust was executed, naming Storrs and Hillhouse as trustees, and imposing a second mortgage and lien on the said Western Division and on certain other property, and providing that after 1886 1 per cent. of the aggregate amount of the principal of the bonds issued should be set aside annually as a sinking fund for their redemption. And in case of default in payment of interest or setting aside of the sinking fund, continuing for more than one year, upon the request in writing of the holders of a majority of the bonds, the trustees were empowered to enter upon and take possession of the property, and to manage and operate it. Huntington and his associates organized the Southern Pacific Company of Kentucky (herein referred to as the Pacific Company), which was incorporated by the Kentucky Legislature on March 17, 1884, and transferred all of their holdings in the Galveston Company and the other connecting roads to it in exchange for its stock. All of the stock of the constituent railroads was retired from circulation and permanently deposited in trust with the Union Trust Company of New York. On February 10, 1885, the Pacific Company entered into a contract, subsequently slightly amended, termed a lease, with the said railroads, including the Galveston Company, and then operated them as a single company by virtue of the contract. By this contract the Pacific Company assumed all the liabilities of the Galveston Company, except the principal of its mortgage indebtedness, and bound itself to pay the interest on the said second mortgage Western Division bonds and to pay the Galveston Company 16¼ per cent. of its (the Pacific Company's) net earnings. The Pacific Company paid the interest on these bonds regularly from 1885 to 1890, and then, the earnings of the system being impaired, the holders of the bonds, who were also large stockholders in the Pacific Company, entered into a verbal agreement to postpone payment of the said interest to certain fixed charges and expenditures to be made by the Galveston Company, and the substance of this agreement, which we will hereafter term the stamped agreement, was indorsed on the bonds. It is in the following words and figures:

"Interest on this bond, notwithstanding the terms and provisions thereof, is to be due only on the 1st day of January of each year until the payment

of the principal sum represented thereby and only at such rate (not exceeding in any event 6 per centum per annum) as the net earnings and income of the Galveston, Harrisburg & San Antonio Railway Company in each year ending on the 1st day of July next preceding the day above fixed for the payment of annual interest hereon shall suffice to pay upon all the bonds of this issue outstanding on such 1st day of January, after first paying from the earnings and income of said company the expenses of and connected with operating its railways and of keeping up and maintaining the same with their appurtenances and all improvements, additions, betterments, renewals, and acquisitions, and for providing and keeping up suitable equipment, and the expenses of conducting said company's business and affairs and maintaining its corporate organization, and after likewise paying from said earnings and income the interest payable from time to time upon the bonds of this company known as the First Mortgage Eastern Division Bonds, Second Mortgage Eastern Division Bonds, and First Mortgage Mexican & Pacific Extension Bonds, which may be from time to time outstanding, and such amounts as may be prescribed to be paid to or towards sinking funds for the payment or redemption thereof. And if in any year the amount as ascertained and determined by the board of directors of said railway company to be applicable to the payment of such annual interest on the bonds of which this bond forms a part shall not be sufficient for the full payment of interest at the rate of 6 per centum per annum thereon, the amount of such deficiency, whether partial or total, shall not be cumulative, nor be made up out of any surplus income of subsequent years, but shall be absolutely waived, relinquished, and discharged."

The Pacific Company owns $27,506,000 of the stock of the Galveston Company out of $27,840,000 issued, and before and after the execution of the lease it was in full control of the Galveston Company, named its rates, and elected its officers, some of whom were always officers of the Pacific Company, and there was no difference whatever in the management and control of the two companies. Shortly after the agreement of February 10, 1885, was entered into, the state of Texas claimed it to be contrary to the laws and public policy of the state. The Pacific Company and the Texas Companies, including the Galveston Company, did not admit it to be so, but nevertheless, in deference to the opinion of the state authorities, abrogated the contract; but complainants allege the agreement was within the corporate powers of each of the companies and that they were authorized by the laws of the states and territories of their incorporation to enter into it. Thereafter the Pacific Company exercised the ownership, management, and control of the Galveston Company, by transferring to certain of its employés sufficient shares of stock to qualify them, and electing them as officers and directors of the Galveston Company. It named its own president as president of the Galveston Company, and ever since then the president of the Pacific Company has been president of the Galveston Company. It elected its own treasurer, located in the city of New York, as assistant treasurer of the Galveston Company, and caused all the moneys of the Galveston Company, after paying taxes and operating expenses, to be remitted to him at New York, and he did not deposit them to the credit of the Galveston Company, but mingled them with the moneys of the Pacific Company. Over $9,000,000 of the Galveston Company's funds have been so transferred since the institution of this suit. Neither the Pacific Company nor the Galveston Company has ever made

any effort to set aside the sinking fund provided for by the deed of trust, and since 1890 no interest whatever has been paid.

The board of directors of the Galveston Company were bound to determine in good faith the amount of earnings and income of the Galveston Company, and keep a correct account, and have not done so. In 1900, and each year thereafter, the board of directors of the Galveston Company wrongfully, and as a mere perfunctory act, passed resolutions declaring they had ascertained there was nothing applicable to the payment of the interest; whereas in truth and in fact there was enough earned, under a proper accounting, to pay the interest on the said second mortgage bonds. The true condition of the Galveston Company is not ascertainable from its books, but can only be ascertained from the books of the Pacific Company. The Pacific Company has wrongfully charged up various items of expense (giving the details) to the Galveston Company, and exacted payment of them in preference to the interest on the said second mortgage bonds. Since 1904 the Pacific Company has earned annually from $11,000,000 to $26,000,-000 surplus over and above all expenses, wherein was included part of the earnings of the Galveston Company, and since 1905 has paid dividends on its stock, including the stock issued in exchange for the stock of the Galveston Company, of from $2,000,000 to $10,000,000 per annum (giving the detailed figures), but leaving the interest on the second mortgage bonds unpaid and the sinking fund not provided for. In 1904 complainants protested against the payment of dividends, and demanded payment of their interest, which was refused. In 1906 complainants notified the trustees of the default in payment of interest, and requested them to enforce the contract rights of the bondholders; but the trustees have failed and refused to do so. Complainants waive the interest from 1890 to 1904, and offer to surrender the coupons for same, on behalf of all other bondholders, except the Pacific Company, as well as complainants. The bill prays for process, for the abrogation of the stamped agreement, for a decree declaring the bonds and coupons valid and maintaining the lien on the Western Division, for the ascertainment of the amount of interest due since January 1, 1904, and the amount of default in the sinking fund, and an order for the payment of same by a day to be fixed, and the enforcement of same by foreclosure and sale and by other incidental orders, for an accounting from the Pacific Company and judgment against it as trustee, and for general relief.

It is contended by defendants in support of their general demurrers that the remedies provided in the mortgage were embodied therein for the protection of the bondholders as a class, expressly made subject to the control of the holders of a majority in amount, and plaintiffs, being minority bondholders, cannot maintain a suit to foreclose the mortgage. Fairly considering their bill, all they are attempting is to collect the interest past due and have the sinking fund made whole, and in their oral and printed arguments they have disclaimed any other intention. It is well settled that, regardless of such provisions of a mortgage, if the contract has been breached, the minority

stockholders cannot be deprived of their right to equitable relief because a majority of the bondholders, whose interests might be adverse, should decline to join with them. This seems to be conceded by defendants; but it is further contended that the stamped agreement constituted a novation, and hence the complainants are not mortgagees, but are simple contract creditors, and have no lien upon the property, and their right of action is plain and adequate at law.

As we read and construe the stamped agreement, it does not amount to a novation. There is no change of debtor or creditor, and no new debt is substituted for the old one. The holders of the bonds, for reasons doubtless good and sufficient to them at the time, agreed to postpone the interest to the payment of the items enumerated; but that is all. The principal of the debt is unimpaired in any event, and the interest is only waived to the extent the net income in any one year is not sufficient to pay it. The lien was not vacated, and it is immaterial, for the purpose of passing upon the demurrers, whether the stamped agreement should be considered voidable or not. If it is set aside, the mortgage and deed of trust would be unimpaired; and, on the other hand, if its provisions have been violated as alleged, complainants' would still be entitled to equitable relief.

From the allegations of the bill it appears that the relations of the Pacific Company to the Galveston Company are not those of mere stock ownership. If, having the absolute power of control over the Galveston Company, the Pacific Company has, either directly or indirectly, deliberately and improperly breached the conditions of the mortgage and stamped agreement, it could not in equity and good conscience escape the obligations thereby imposed. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310.

The board of directors of the Galveston Company are given no arbitrary power to say what shall be paid in preference to the interest on the bonds. They are to be guided and restricted by the stamped agreement, and it is their duty to honestly and truthfully determine what expenditures were properly privileged. No part of the earnings of the Galveston Company, either derived from its local business or as a part of the Southern Pacific System, could be applied to the payment of debts or expenses not privileged by the stamped agreement, nor to pay dividends on the stock of the Pacific Company to the detriment of the bondholders.

It is alleged that the true condition of the Galveston Company cannot be ascertained from its books, but can only be ascertained from the books of the Pacific Company, and an accounting by the Pacific Company is sought. To that extent, at least, the bill would lie against the Pacific Company; and if it has, as alleged, improperly applied the earnings of the Galveston Company, that ought to have been applied to the payment of the interest on these bonds, necessarily it could be forced to refund the same.

The general demurrers also set up that all the other bondholders are necessary parties to the suit. While they are no doubt proper parties,

if the minority bondholders have standing to prosecute a suit in equity for the enforcement of their individual rights, it necessarily follows that they are not indispensable, there being no question as to jurisdictional amount involved.

The seventh demurrers, filed May 18, 1910, go to "all that part of the bill," etc., without identifying by line, paragraph, or page the part demurred to, and perhaps, in the interest of good pleading, should have been overruled for that reason alone. They set up that the agreement of February 10, 1885, "as appears from the allegations of said bill," are ultra vires of the defendants and void in law. As we read the bill, no such allegation is made, but the allegation is as above set out. But, even if it were true that this agreement was void as contended, the Pacific Company could not escape the obligations and liability arising from its alleged conduct.

Without going into a more extended discussion of the demurrers filed by the defendants and sustained by the court, we do not find on careful consideration that the bill is multifarious, or contains scandalous or impertinent allegations. It is based on a single cause of action, and while plaintiffs ask for the cancellation of the stamped agreement, and in the alternative for a judgment, even if it is not canceled, in either event their rights would be the same, and they would be entitled to identical relief.

In view of the length of time the suit has been pending without issue being joined, we have also examined the demurrers not passed upon by the lower court, and are of the opinion that all the demurrers should be overruled. The cross-bill of Storrs and Hillhouse was properly dismissed.

The decree is reversed, and the cause remanded, with instructions to overrule all the demurrers.