REA EXPRESS, INC., Plaintiff,

v.

The **ALABAMA GREAT SOUTHERN RAILROAD COMPANY** et al., Defendants.

No. 71 Civ. 4278.

United States District Court, S. D. New York.

June 5, 1972.

852

Anderson, Allegaert & Russell, New York City, for plaintiff; Eugene R. Anderson, Donald A. Herner and Arthur M. Wisehart, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendants Chesapeake and Ohio R. Co., Baltimore and Ohio R. Co. and Western Maryland R. Co.; Carl E. Newton, M. Lauck Walton, David A. Cutner and Michael J. Thomas, New York City, of counsel.

METZNER, District Judge:

Defendants Chesapeake and Ohio Railway Co., Baltimore and Ohio Railroad Co. and Western Maryland Railway Co.

move pursuant to Rule 12(b) (1), Fed. R.Civ.P., to dismiss the complaint on the ground that the court lacks jurisdiction over the subject matter. The moving defendants assert that plaintiff's complaint constitutes an attack upon the validity of existing orders of the Interstate Commerce Commission, which must be brought before a three-judge court pursuant to the Urgent Deficiencies Act, 28 U.S.C. §§ 2321–2325.

Plaintiff REA Express is a Delaware corporation with its principal place of business in New York City. It is a common carrier under the jurisdiction of the Interstate Commerce Commission. Of the 61 defendants, 56 are railroad corporations which currently hold notes issued to them by REA in 1959, two are railroad corporations which formerly held such notes, and three, including the United States, are named as assignees of REA notes.

Jurisdiction is asserted under § 4 of the Clayton Act, 15 U.S.C. § 15, under 28 U.S.C. § 1331, under diversity of citizenship, 28 U.S.C. § 1337, and under pendent jurisdiction. Plaintiff seeks damages for alleged breaches of the antitrust laws, breaches of fiduciary relationship and violations of the Interstate Commerce Act. In addition, it seeks a declaratory judgment that the notes in suit are void.

An understanding of the issues raised by the present motion requires a rather detailed review of the factual background of this case. On January 23, 1929, substantially all of the railroads in the United States entered into a joint venture to conduct the railway express business in this country. Pursuant to that end, they formed REA as their exclusive agent for carrying on the business.

REA was to have 1,000 shares of common stock, to be distributed to the railroads participating in the joint venture in proportion to the express business done by them during a base period from 1923 to 1926. There were 15 members on the board of directors, each an officer or director of one of the participat-

ing railroads. Uniform operating agreements were executed between REA and each participating railroad. Identical agreements were to be executed with railroads which used the facilities, but chose not to participate as shareholders. Under these agreements, annual revenues of REA, after deduction of operating costs, would be distributed to all railroads executing operating agreements in proportion to their use.

In order to procure funds with which to purchase the assets of the existing express company and to provide working capital, REA proposed to issue $32,000,000 of 5% bonds (the 1929 bonds) for sale to the public. REA undertook to make semi-annual sinking fund payments to the indenture trustee in the amount of $800,000, which were to be treated as business expenses and deducted from operating revenues before any distributions to the user railroads.

Pursuant to §§ 5(1), 5(2) and 20a of the Interstate Commerce Act, 49 U.S.C. §§ 5(1), 5(2), 20a, the railroads applied to the ICC for approval of these transactions, and the Commission issued an opinion and order expressly approving the issuance of the bonds, the distribution of common stock, and the pooling of earnings. Securities and Acquisition of Control of Railway Express Agency, Inc., 150 I.C.C. 423 (1929). This order and the other orders of the ICC involved in this matter will be discussed below.

Subsequently, on April 11, 1929, the board of directors of REA adopted a resolution which altered the method of making the sinking fund payments. This resolution, adopted just before the first payment was due, provided that the payments were to be made proportionately by the shareholding railroads directly to the trustee, with these railroads being credited on REA's books as holders of "Non-Negotiable Debt to Affiliated Companies—Advances" [Non-Negotiable Debt]. Thus the distributable revenue of REA was to be calculated without deducting the sinking fund payments. REA was to be charged interest

of 5¼% per annum on the Non-Negotiable Debt.

Approximately $15,200,000 had been paid into the sinking fund by December 31, 1938, of which $2,600,000 had been repaid to the railroads by REA, leaving an outstanding Non-Negotiable Debt of $12,600,000. An additional $800,000 sinking fund payment was due on March 1, 1939, and was paid by the railroads.

By 1938 REA was desirous of retiring the 1929 bonds because of the lower interest rates then prevailing. To that end, the board of directors determined to call the remaining $16,000,000 in outstanding bonds for redemption on March 1, 1939. To obtain the funds necessary, the board proposed to issue a like amount of serial notes bearing lower interest rates. These notes (the 1938 notes) were to be sold to the public and would mature in 20 semi-annual installments in the amount of $800,000. Funds for the payment of the notes as they matured were to be advanced by the shareholding railroads and treated as additional Non-Negotiable Debt. REA was to be charged 5% interest on this new Non-Negotiable Debt. Pursuant to § 20a of the Interstate Commerce Act, REA applied for and received approval by the ICC to issue the notes. Railway Express Agency, Inc., Notes, 230 I.C.C. 478 (1938).

By July of 1959 the 1938 notes had been paid off. However, the Non-Negotiable Debt had reached a level of $27,637,053.80, and the REA board of directors authorized a new set of promissory notes to be issued in exchange for and as evidence of the Non-Negotiable Debt to each creditor railroad in proportion to its share of the debt. A sinking fund was established for the purpose of paying interest and principal on the notes into which REA undertook to pay each year an amount equal to 10% of its net income for the year. In an unpublished order dated September 25, 1959, the ICC approved issuance of these notes pursuant to § 20a of the Interstate Commerce Act. Approval noted Railway Ex-

press Agency, Inc., Notes, 307 I.C.C. 805 (1958). REA paid about $525,000 into the sinking fund, leaving $27,206,375.84 principal amount of the 1959 notes outstanding on September 30, 1971.

In addition, in 1959 the railroads entered into a new and amended standard operating agreement, to become effective on October 1, 1959, and continue until December 31, 1973. Pursuant to § 5(1) of the Interstate Commerce Act, the railroads applied for and received ICC approval of the new agreement. Express Contract, 1959, 308 I.C.C. 545 (1959).

The motivating factor for the new operating agreement was the increasing dissatisfaction of the railroads with REA's earnings record. The withdrawal and amendment terms were liberalized to appease some railroads which wanted to end the joint venture altogether and liquidate REA. In the next several years, the earnings picture for the company got no better, and in 1967 and 1968 REA management made several unsuccessful attempts to find a purchaser for the REA stock owned by the railroads.

REA's financial adviser informed management that no interested purchaser would be found unless the 1959 operating agreement was terminated and REA freed from railroad control. In light of this advice, most of the shareholding railroads deposited their stock in a voting trust on June 10, 1968, the trustees of which were not associated with the railroads. The trustees were given full powers of shareholders, including the power to sell their shares if the owners of voting trust certificates representing a majority of the deposited stock approved the sale. In addition, by June 18, 1968, it was agreed that the 1959 operating agreement be terminated on December 31, 1968.

On June 23, 1969, the voting trustees received an offer to purchase their REA stock from 5 executive officers of that company. The purchase price was $1 per share plus ³⁄₁₀ of a warrant in a new company to be called the REA Holding Corporation. The offer was to remain in effect until July 9, 1969.

By that date the voting trustees had received consents to the offer from a majority of the deposited stock and the offer was accepted. On August 1, 1969, the formal agreement of sale was executed, and by August 21, 1969, the deal had been consummated. Slightly more than two years later the present lawsuit was filed.

REA asserts that various of the transactions described above were caused by the shareholding railroads through their control of REA's board of directors and violated § 10 of the Clayton Act, 15 U.S.C. § 20, and § 20a of the Interstate Commerce Act. § 10 of the Clayton Act makes it unlawful for any common carrier to deal in securities, supplies, or other articles of commerce with another corporation with which it has an interlocking directorate unless those dealings are carried out by means of competitive bidding. § 20a of the Interstate Commerce Act provides that any issuance of stocks, bonds or other evidence of indebtedness of a common carrier shall be void unless authorization therefor has been given by the ICC after an investigation into the purposes and uses of the proceeds of the issuance and a finding that the issuance is for a lawful object, compatible with the public interest, and necessary for performance by the carrier of its services.

REA's complaint contains, in essence, four claims. The first is based on purported violations of § 10 of the Clayton Act. It charges that the Non-Negotiable Debt constituted "securities" or "articles of commerce" within the meaning of § 10 and that the following transactions between REA and its controlling railroads involving the Debt occurred without competitive bidding:

(a) The initial creation of the Non-Negotiable Debt by the resolution of April 11, 1929, in connection with the sinking fund for the 1929 bonds;

(b) The partial repayment of the Non-Negotiable Debt by REA between 1929 and 1938;

(c) The creation of additional Non-Negotiable Debt in connection with the 1938 notes;

(d) The repayment of the outstanding Non-Negotiable Debt by means of the 1959 notes.

Under this first claim REA further contends that § 10 was violated by issuance of the 1959 notes without competitive bidding to those railroads to whom REA was indebted on account of the Non-Negotiable Debt.

REA's second claim is based on alleged violations of § 20a of the Interstate Commerce Act and on general contract law. It is charged that the Non-Negotiable Debt constituted "stocks," "bonds" or "other evidence of indebtedness" within the meaning of § 20a which was never submitted to the ICC for approval and is therefore void. REA asserts that since the Non-Negotiable Debt is void, the 1959 notes, which were issued as evidence of and in consideration for the Debt, are likewise invalid and unenforceable.

The third claim by REA is based on general contract law. It is charged that the validity of the 1959 notes depended upon the continued existence of the 1959 operating agreement in the form approved by the ICC, and that the premature termination of the agreement in 1968 rendered the notes null and void.

REA's final claim is based on common law breach of fiduciary duty. It is charged that the directors of REA, who were simultaneously directors or officers of the shareholding railroads, breached their fiduciary duty to REA by permitting or authorizing the acts detailed in the other three claims.

The relief sought by REA includes damages and a declaration that both the Non-Negotiable Debt and the 1959 notes are null and void.

It is the position of the moving defendants that each of the transactions in issue was undertaken in accordance with valid and subsisting orders of the ICC which approved of the action taken and when necessary granted exemption from the antitrust laws, that for REA to be successful in its suit it must impeach those orders, and that this may be done only before a three-judge court pursuant to the Urgent Deficiencies Act, 28 U.S.C. §§ 2321–2325.

The procedures of the Urgent Deficiencies Act must be followed in any action "to enforce, suspend, enjoin, annul, or set aside in whole or in part any order of the Interstate Commerce Commission. . . ." § 2321. All such actions must be brought by or against the United States. § 2322. The Commission and other interested parties may intervene as of right. § 2323. And an interlocutory or permanent injunction restraining the enforcement, operation, or execution, in whole or in part, of a Commission order may be granted only by a three-judge federal court. § 2325.

■■ A lawsuit may fall within the requirements of the Urgent Deficiencies Act even though there be no request by the plaintiff that a Commission order be set aside and even though no specific order be mentioned on the face of the pleadings. If it can be established extrinsically that the practical effect of success on the merits by the party making the claim would be to invalidate, countermand or contradict an ICC order, the Act applies and its requirements must be met. Venner v. Michigan Central Railroad Co., 271 U.S. 127, 46 S.Ct. 444, 70 L.Ed. 868 (1926); B. F. Goodrich Co. v. Northwest Industries, Inc., 424 F.2d 1349 (3rd Cir.), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); Schwartz v. Bowman, 244 F. Supp. 51 (S.D.N.Y.1965), aff'd per curiam, 360 F.2d 211 (2d Cir.), cert. denied, 385 U.S. 921, 87 S.Ct. 230, 17 L. Ed.2d 145 (1966); United States v. Railway Express Agency, 101 F.Supp. 1008 (D.Del.1951). Plaintiff cannot avoid the dictates of the Urgent Deficiencies Act merely by confining the relief sought to money damages. Although 28 U.S.C. § 2325 speaks in terms

of "injunctions," the cases have held that the Act applies to damage actions as well. Suffin v. Pennsylvania Railroad Co., 276 F.Supp. 549 (D.Del.1967), aff'd per curiam, 396 F.2d 75 (3rd Cir. 1968), cert. denied, 393 U.S. 1062, 89 S. Ct. 713, 21 L.Ed.2d 705 (1969).

Determination of the present motion requires consideration of two questions: First, did the ICC issue orders approving of and granting antitrust exemptions to the various transactions complained of by REA? Second, if so, does the present lawsuit involve, directly or indirectly, an attack upon the validity of those orders?

In considering these questions, it is best to divide the challenged transactions into two groups: those transactions involving the Non-Negotiable Debt and those involving the 1959 notes.

Turning to the first of these groups, analysis of the various opinions and orders in question reveals that the Commission at no time, directly or indirectly, approved the Non-Negotiable Debt as necessary to the joint venture. Indeed, in its 1929 opinion, the Commission took pains to emphasize that such approval would be beyond the limited nature of its authority under § 5 of the Interstate Commerce Act:

"The particular portion of the operating agreement to which our jurisdiction extends and which requires our approval under paragraph (1) of section 5 is the pooling of earnings arrangement. . . ." 150 I.C.C. at 433–34.

Significantly, after describing the proposed method of treating sinking fund payments as operating expenses and expressing some reservations, the Commission stated:

"It should be understood that all we are here passing upon is the plan for pooling and dividing earnings and we are not passing upon other provisions of the contract, such as that mentioned above." 150 I.C.C. at 434.

■ The opinion and order approving the 1938 notes must likewise be read re-

strictively. In its opinion, the ICC stated that funds for repayment of the notes were to be advanced by the shareholding railroads and treated as debt owed to them by REA. The defendants argue that this constituted retroactive approval of the Non-Negotiable Debt. However, as is made clear in the 1929 opinion, the mere fact that a contract provision is described by the ICC does not mean that it has been approved. The court in United States v. Railway Express Agency, 89 F.Supp. 981 (D.Del. 1950), was presented with an analogous situation and held that a discussion of the exclusive agency provision of the operating agreement in the Commission's 1929 opinion constituted neither approval of nor a grant of antitrust immunity for that provision.

■ Whether there has been approval must be judged in light of the scope of the ICC's authority in the particular application which it had under consideration. The 1938 proceeding was brought pursuant to § 20a of the Interstate Commerce Act, which requires the Commission to determine whether an issuance of securities or evidence of indebtedness by a common carrier is for a lawful object, compatible with the public interest, and necessary for performance of the carrier's services. The ICC made such a finding with respect to the 1938 notes. But this cannot be taken as a determination of the propriety of the method for financing repayment of those notes. Apart from describing the Non-Negotiable Debt, the Commission in its opinion and order nowhere indicated what its views were as to the legality of the Debt.

Similarly, the order issued pursuant to § 20a approving the 1959 notes cannot be read as approval of the Non-Negotiable Debt. It is true that the Commission in its order stated that REA was indebted to its shareholding railroads for funds advanced to pay off the 1929 bonds and 1938 notes, and that the new notes were to be issued as evidence of that debt. However, this again is just a recitation of fact; the mere statement

that debt exists on the books of REA does not constitute approval of the methods by which that debt accrued.

The defendants argue that the additional finding by the Commission that the 1959 notes were lawful, necessary and appropriate was effective approval of the Non-Negotiable Debt, which formed the consideration for the notes. This is too broad a reading of the order. The ICC was merely declaring that notes issued as evidence of debt which appears on a carrier's books are lawful, proper, and necessary. But this alone is not a finding that the underlying debt itself is valid.

■ The order approving the 1959 notes was unaccompanied by an opinion, and therefore it is impossible to determine what consideration the Commission gave to the question of the validity of the Non-Negotiable Debt. In view of this vacuum of proof, the court is not justified to infer that by approving the 1959 notes the Commission meant to grant a broad retroactive antitrust exemption to the Non-Negotiable Debt. Immunity from the antitrust laws is not to be lightly found. Repeals by implication are not favored, and orders of administrative agencies must be strictly construed. Trans World Airlines, Inc. v. Hughes, 214 F.Supp. 106 (S.D.N.Y. 1963), aff'd, 332 F.2d 602 (2d Cir. 1964). Absent clear language by the ICC, courts are loath to read antitrust exemptions into Commission orders. See United States v. Railway Express Agency, supra.

■ Thus it seems clear that there was no order of the ICC specifically approving the Non-Negotiable Debt. Consequently, any attack on transactions involving the Debt does not constitute an attack on an order of the ICC under the Urgent Deficiencies Act.

Defendants urge, however, that the creation of the Non-Negotiable Debt was necessary to carry out the joint venture approved by the ICC, and was, therefore, immunized from the antitrust laws.

Under § 5(1) of the Interstate Commerce Act, any agreement by common carriers to pool traffic, service or earnings is unlawful unless approved by the Commission upon a finding that such agreement is in the interest of better service and will not unduly restrain competition. According to § 5(11) of the Act, carriers participating in a transaction approved by the Commission under § 5(1) are relieved from operation of the antitrust laws "insofar as may be necessary to enable them to carry into effect the transaction so approved. . ."

■ Hence, if the Non-Negotiable Debt were necessary to the joint venture, which was approved under § 5, it would be exempt from the antitrust laws, including the competitive bidding requirement of § 10 of the Clayton Act. Minneapolis & St. Louis Railway Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959); Suffin v. Pennsylvania Railroad Co., supra. However, determination of the necessity to the joint venture of the Non-Negotiable Debt does not require an attack upon an ICC order absent a ruling by the ICC of such necessity. There is no such ruling in this case and therefore claims based on a determination of such necessity do not fall within the purview of the Urgent Deficiencies Act.

Defendants' motion is denied insofar as it seeks dismissal of those parts of REA's complaint which are based upon the assertion that certain transactions involving the Non-Negotiable Debt occurred without competitive bidding.

This leaves for consideration the transactions involving the 1959 notes. As indicated above, REA makes three claims with respect to those notes: first, that their issuance without competitive bidding violated § 10 of the Clayton Act; second, that they are unenforceable because the underlying consideration for them, the Non-Negotiable Debt, having never been approved by the ICC, is void under § 20a of the Interstate Commerce Act; and third, that the premature termination of the

1959 operating agreement removed a condition upon which the validity of the notes depended and rendered them null and void.

The first two of these claims directly attack a valid and subsisting ICC order —the order of September 25, 1959, approving the notes.

As to the first claim, the 1959 ICC order expressly authorized REA to issue notes to its 66 creditor railroads in exchange for the Non-Negotiable Debt and held that this was "necessary and appropriate for and consistent with the proper performance by it of service to the public as a common carrier. . . ." This is clearly a ruling by the Commission that the 1959 notes could be issued to specified companies without competitive bidding and that issuance of the notes was necessary to the joint venture approved initially in 1929.

REA argues that the 1959 order cannot be interpreted as granting an antitrust exemption for the notes because the order was issued pursuant to § 20a, under which the Commission has no authority to grant such an exemption. It is true that § 20a does not confer power to grant immunity from the antitrust laws. Denver & Rio Grande Western Railroad Co. v. United States, 387 U.S. 485, 496–497, 87 S.Ct. 1754, 18 L. Ed.2d 905 (1967). However, when securities are issued in conjunction with activity which has been approved under § 5 of the Act and the ICC specifically finds the issuance necessary to carry out the approved activity, the issuance will share the latter's immunization. Denver & Rio Grande Western Railroad Co. v. United States, *supra* at 497, 87 S.Ct. 1754; Minneapolis & St. Louis Railway Co. v. United States, *supra*; Suffin v. Pennsylvania Railroad Co., *supra*.

In any event, it is unnecessary on the present motion to determine the scope of the Commission's exemptive power. Suffice it to say, the 1959 order by its plain terms grants REA the right to issue notes without competitive bidding to 66 named railroads. If plaintiff believes that this action exceeded the Commission's authority, its remedy is before a three-judge court pursuant to the Urgent Deficiencies Act.

REA's second claim, that the 1959 notes are unenforceable due to failure of consideration, also attacks the 1959 order authorizing the notes. Pursuant to § 20a, the Commission may not grant permission to issue notes unless it finds that the notes are for a lawful object necessary for the performance of the carrier's services. The ICC expressly found that the 1959 notes were to be evidence of the Non-Negotiable Debt and held that to be a necessary and appropriate purpose. A claim that the consideration for the notes was worthless is a direct challenge to that ICC finding and must be brought before a three-judge court pursuant to the Urgent Deficiencies Act.

It should be noted that there is no inconsistency in allowing REA to assert antitrust claims based on the Non-Negotiable Debt in this court while requiring a challenge to the 1959 notes based on the Non-Negotiable Debt to proceed under the Urgent Deficiencies Act. The 1959 notes order merely held that the Non-Negotiable Debt existed on the books of REA, and that the notes could be issued as evidence of the debt. This does not amount to a finding under § 20a that the Non-Negotiable Debt was necessary and appropriate to the joint venture and thus immune from the antitrust laws.

Insofar as REA's complaint asserts claims based on issuance of the 1959 notes without competitive bidding and on the fact that the consideration for the notes was the Non-Negotiable Debt, it is dismissed.

REA's final claim is that the 1959 notes are unenforceable due to the premature termination of the 1959 operating agreement. Under this claim, REA takes the position that even though the notes might have been valid when issued, they were rendered null and void by subsequent conduct of the railroads.

The court is of the opinion that this claim does not involve a challenge to ICC orders. There is no order approving the amendment which changed the termination date of the 1959 agreement from December 31, 1973 to December 31, 1968. There is no order approving the procedures by which the agreement was amended. There is no order indicating that the Commission conditioned approval of the 1959 notes upon the continued existence of the 1959 operating agreement.

It is true that the Commission in its opinion on the 1959 agreement described the withdrawal and amendment procedures and termed them "liberal and reasonable." However, as with the sinking fund provisions in 1929, this is merely a recitation of facts and does not constitute approval. In 1959, as in 1929, the Commission's authority extended only to approving the pooling of earnings arrangement.

In addition, the fact that the Commission stated that a sinking fund for repayment of the 1959 notes would be established from earnings under the operating agreement does not mean that the Commission was ruling the notes unenforceable without the agreement. After all, the Commission was aware that certain railroads desired to terminate the joint venture altogether and that the new withdrawal and amendment provisions were incorporated to appease those roads. Under the circumstances, if the Commission had meant to condition approval of the notes upon the continued existence of the operating agreement, it would have specifically so stated.

This is not to say that the validity of the 1959 notes was *not* conditioned upon continuance of the operating agreement. The court is merely holding that no ICC order made it a condition.

Defendants' motion is denied insofar as it seeks dismissal of those parts of REA's complaint which are based on the assertion that the 1959 notes are null and void due to the premature termination of the 1959 operating agreement.

Defendants' motion to dismiss is disposed of in accordance with the above opinion.

So ordered.