The **NATIONAL SMALL SHIPMENTS TRAFFIC CONFERENCE, INC.,** et al., Plaintiffs,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants.

No. 74 Civ. 1265.

United States District Court, S. D. New York.

Dec. 24, 1974.

Belnap, McCarthy, Spencer, Sweeney & Harkaway, Daniel J. Sweeney, Washington, D. C., Arsham & Keenan, Arthur A. Arsham, William Q. Keenan, New York City, for plaintiffs.

Michael Devorkin, Asst. U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, Thomas E. Kauper, Asst. Atty. Gen., for defendant United States of America.

Theodore C. Knappen, Washington, D. C., for defendant Interstate Commerce Commission.

Homer S. Carpenter, John S. Fessenden, Bryce Rea, Jr., Washington, D. C., John R. Mahoney, New York City, for intervening defendants Central & Southern Motor Freight Tariff Association, Inc., and others.

John P. Tynan, New York City, Bryce Rea, Jr., Washington, D. C., for intervening defendants Household Goods Carriers' Bureau, Inc. and Steel Carriers' Tariff Association, Inc.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., Washington, D. C., for intervening defendant Commonwealth of Pennsylvania.

White & Case, New York City, Wayne L. Emery, Pittsburgh, Pa., for intervening defendant United States Steel Corp.

Cravath, Swaine & Moore, John Linsenmeyer, New York City, for intervening defendant Bethlehem Steel Corp.

Before MULLIGAN, Circuit Judge, and PIERCE and STEWART, District Judges.

## OPINION

STEWART, District Judge:

Plaintiffs, national associations of shippers, filed this action[1] on March 19, 1974, challenging the validity of special permission orders[2] issued February 7 and 8, 1974 by the Interstate Commerce Commission ("ICC")[3] authorizing six percent fuel surcharges for motor

---

1. This action is brought pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325 and 5 U.S. C. § 551 et seq., (the Administrative Procedure Act). The action was brought against the ICC and the United States; this court later permitted numerous parties—primarily associations of carriers—to intervene as defendants.

2. The Interstate Commerce Commission is authorized to grant special permission orders under 49 U.S.C. § 317, which provides an exception to the normal ratemaking procedures utilized by the Commission. Section 317 provides in relevant part:

The Commission may, in its discretion and for good cause shown, allow such change [in any rate, fare, charge, or classification, or any rule, regulation or practice affecting such rate, fare, charge or classification, or the value of the service thereunder, specified in any effective tariff of a common carrier

by motor vehicle] upon notice less than that herein specified [30 days] or modify the requirements of this section with respect to posting and filing of tariffs either in particular instances or by general order applicable to special or peculiar circumstances or conditions.

3. The challenged orders were entered in proceedings entitled Special Permission No. 74–2525, Emergency Fuel Surcharge for Line-Haul Transportation Charges and Other Charges-Motor Common Carriers. The assailed orders were entered by the ICC without notice to the public and without hearings or other proceedings for the receipt of evidence, views and comments. The Commission thereby authorized the motor common carriers throughout the United States to post on one day's notice a percentage fuel increase surcharge in their rates and charges of up to six percent.

carriers.[4] The complaint alleges that these special permission orders of the ICC are unlawful because, *inter alia,* they were approved in violation of the ICC's statutory rules and requirements, they were an abuse of discretion, they were violative of the Administrative Procedure Act and they were in contravention of the National Transportation Policy.[5]

Oral argument was held before this three-judge panel on May 9, 1974, at which time plaintiffs announced that they were contracting the scope of the relief sought. Instead of requesting that the ICC's special permission orders be set aside in toto, plaintiffs urged that they be set aside only insofar as they applied to general commodities tariffs of general commodities bureaus.[6] The thrust of this change was to exclude from the relief sought so-called owner-operators, truckers who concededly were affected most by the sharp rises in fuel prices during the past year and a half. The general commodities carriers, on the other hand, generally employed their own drivers, and spent a smaller percentage of their total revenues on fuel costs. Consequently, they were presumably less in need of the six percent fuel surcharge authorized by the ICC than the owner-operators. Plaintiffs contend that these general commodities carriers in fact received a windfall as a result of the fuel surcharges authorized for all motor common carriers.

On July 10, 1974, the ICC issued a report and order in Ex Parte No. MC–92, Investigation of Impact of Rising Costs on Motor Carriers, which declared that its challenged special permission orders would expire on August 26, 45 days from the report's service date, July 10, 1974.[7] Subsequently, by order of July 18th, the Commission stated that all sur-

4. Soon after the issuance of the special permission orders, motor common carriers and rate bureaus acting on their behalf published surcharges pursuant to the special permission orders. Most carriers utilized the full six percent allowable under the special permission orders.

5. The special permission orders challenged here were approved by the ICC as part of a settlement to end a work stoppage by many of the nation's truckers brought on last winter by the energy crisis and its attendant rapidly rising fuel costs. In promulgating Special Permission Order No. 74–2525, the Commission found that "in view of the critical fuel situation prevailing throughout the Nation, and its effect upon modes of transportation subject to this Commission's jurisdiction, immediate relief is warranted to permit motor common carriers to expeditiously recover increased fuel costs," and recognized that "the authority granted [in an earlier special permission order] did not entirely meet the immediate need of such carriers because of the requirements of extensive cost data and for 10 days' notice."

6. The Commission found that the retail price of diesel fuel had risen 59 percent (from 21.3 cents to 33.8 cents per gallon) between May 15, 1973 and January 25, 1974. The Commission applied these increases to the recognized fuel cost-to-revenue ratio of the owner-operators and the employee/driver operations of regular route carriers, and determined that motor carriers utilizing principally owner-operators would require an overall rate increase of approximately nine percent and carriers whose trucks were driven by employed drivers would require an increase of less than three percent. Thus the Commission allowed a six percent surcharge, the "average" between the estimated fuel costs of the two groups. Joint Memorandum of the United States of America and the Interstate Commerce Commission in Opposition to the Motion for a Preliminary Injunction, at 7–8.

7. The Commission found:
(1) that the 6 percent fuel surcharge, as used by the respondent motor common carriers to meet their increased fuel costs and other (non-labor) expenses, has not resulted in excessive or unreasonable profits to such carriers on a nation-wide basis, (2) that the use of the surcharge to meet in addition to fuel costs other non-labor expense was contrary to the intent of the surcharge, (3) that the surcharge while having served a useful purpose is no longer necessary and should be cancelled 45 days from the date of the service of this report and order, (4) that motor common carriers . . . may file for increases in their rate fares and charges to the extent they can justify same, and (5) that this decision is not a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

charges instituted pursuant to its special permission orders not voluntarily cancelled by August 26, 1974, would be declared void and cancelled on that date, the expiration date of the special permission orders.

Following this turn of events, we requested the parties to consider whether the present action had become moot by reason of the expiration of the challenged special permission orders.

Plaintiffs contend that notwithstanding the expiration of the special permission orders issued in February this action is not moot. They state three arguments against mootness: (1) the decision on the merits here would be determinative of possible future litigation involving the validity of the ICC's orders; (2) the issues here are likely to recur; and (3) the issues here are of great public importance. We shall consider each of these arguments in turn.

### I.

As the Supreme Court has noted, "The inability of the federal judiciary 'to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" DeFunis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705–1706, 40 L.Ed.2d 164 (1974) (citations omitted). The Court has also stated that it has no power to issue advisory opinions and that "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

Plaintiffs contend that although this action will not presently affect the litigants, it may determine the right of plaintiffs—or their individual members —to bring a subsequent antitrust action to recover refunds or reparations collected by carriers under the allegedly invalid special permission orders.[8] Plaintiffs maintain that a decision by this court invalidating the special permission orders is a necessary predicate to the bringing of such an antitrust action. Plaintiffs argue that an exception to the mootness doctrine is warranted "[i]f there is substantial likelihood that the decision of the court will be determinative in some future litigation between the same parties or their privies . . . ." Meyers v. Jay Street Connecting Railroad, 288 F.2d 356, 359 (2d Cir. 1961).

We believe that *Meyers* is distinguishable from the instant case, and, furthermore, that a finding of mootness here would not preclude a determination of the merits in a subsequent antitrust action. *Meyers* involved an appeal by a railroad and four of its officers and directors from an order of the district court enjoining them from abandoning certain railroad tracks until a certificate of the Interstate Commerce Commission permitting such abandonment became effective. Before the appeal was heard, the ICC issued the required certificate. In this context the court considered whether the ICC's action had mooted the appeal, and found that it had not. The court held that the appeal was not moot since the preliminary injunction was conditioned upon the giving of a $50,000 bond to cover the railroad's losses in the event that a permanent injunction was found to be improper. The court predicted that there was an "overwhelming" likelihood that the railroad would bring a subsequent suit on the bond if victorious on appeal. The court concluded that if it were to hold the case moot,

---

8. A subsequent action, alleging violations of the antitrust laws, apparently would be brought on the theory that the carriers enacted fuel surcharges following the issuance of Special Permission Order No. 74–2525 in the absence of statutory authority by the ICC to waive its normal process of collective ratemaking under 49 U.S.C. § 5b. That section provides that carriers may join together in rate bureaus to jointly consider and establish rates collectively "under such rules and regulations as the Commission may prescribe." It further provides that the carriers party to such an agreement are "relieved from the operation of the antitrust laws. . . . "

with a direction to the district court to vacate its injunction so that that finding would not be res judicata between the parties, the issue of whether the injunction properly could have been issued would have to be reargued in a later action to obtain judgment on the bond. Thus, the court found that considerations of judicial economy, as well as the continuing adverseness of the parties, militated against a finding of mootness.

In the instant case the situation is different. Here there has been no initial determination of the validity of the ICC's special permission orders. If we determine that this case is moot, the validity of the ICC's orders would be litigated for the first time in any subsequent action which may be brought. Furthermore, we do not think that there is an "overwhelming" likelihood that a subsequent antitrust action will be brought. Plaintiffs have frequently indicated that they might bring an antitrust action to collect reparations from the carriers, but have never stated a definite intention to do so.[9] We think it would be inappropriate for this court to decide the merits of this case based upon a speculative possibility that a later action might be brought involving the same or similar parties.[10]

More important, we do not believe that a finding of mootness here would preclude plaintiffs or their privies from bringing a later antitrust action, as plaintiffs contend.[11] Plaintiffs concede that any antitrust action must fail unless the ICC's special permission orders

are held invalid. They point out that the ICC's special permission orders can only be found invalid in an action brought pursuant to the Urgent Deficiencies Act, 28 U.S.C. §§ 2321–2325, such as the one here. That Act requires that actions "to enforce, suspend, enjoin, annul or set aside in whole or in part any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures, . . ." shall be brought "by or against the United States." 28 U.S.C. §§ 2321, 2322. The Act further provides that when injunctive relief is sought the action must be brought before a three-judge court, pursuant to 28 U.S.C. § 2284 and § 2325. In addition, the Act provides that the ICC and any party or parties in interest to the proceeding before the Commission may intervene as of right. 28 U.S.C. § 2323.

Plaintiffs cite to us several cases for the proposition that where an antitrust action is brought directly or indirectly involving the validity of ICC orders, the validity of those orders must perforce be determined in a prior proceeding before a three-judge court pursuant to the Urgent Deficiencies Act. REA Express, Inc. v. Alabama Great Southern Railroad Co., 343 F.Supp. 851 (S.D.N.Y.1972), aff'd, 412 U.S. 934, 93 S.Ct. 2774, 37 L. Ed.2d 393 (1973); Schwartz v. Bowman, 244 F.Supp. 51 (S.D.N.Y.1965), aff'd on the opinion below, 360 F.2d 211 (1966), cert. denied, 385 U.S. 921, 87 S. Ct. 230, 17 L.Ed.2d 145 (1966); United States v. Railway Express Agency, 101

---

9. In light of the Commission's finding in Ex Parte No. MC–92 that the six percent fuel surcharge did not result in "excessive or unreasonable profits" to the carriers, it is not clear that any later damages action will be brought. This is so because the Supreme Court held in Keogh v. Chicago & Northwestern Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), that a private shipper could not bring a treble damages antitrust action where the ICC had previously determined that the rates complained of were reasonable and non-discriminatory.

It is not clear that plaintiffs here would be able to bring a treble damages antitrust ac-

tion, since the general rule in this circuit is "that an association lacks standing to assert an antitrust claim on behalf of its members under § 4 of the Clayton Act." Nassau County Association of Ins. Agents v. Aetna Life & Cas. Co., 361 F.Supp. 967, 969 (S.D.N.Y.1973) (citations omitted) (Stewart J.). Nothing would prevent the individual shipper members of plaintiffs' organizations from filing an antitrust action, however.

10. See Hall v. Beals, 396 U.S. 45, 49, 90 S.Ct. 200, 202, 24 L.Ed.2d 214 (1969).

11. See note 9, *supra.*

F.Supp. 1008 (D.Del.1951). Plaintiffs' reliance on those cases is misplaced. In those cases, the courts held that an action which directly or indirectly involved the validity of ICC orders, including an action for damages only, must be brought under the Urgent Deficiencies Act before a three-judge court.[12] The courts found that a single judge did not have jurisdiction to entertain such actions. Contrary to plaintiffs' understanding, however, none of those courts indicated that two proceedings—one to challenge the ICC orders, and a second to decide the merits of the antitrust (or other) damages claim—would be necessary. Nor could any of those courts properly have done so. In a case quite similar to the instant case, the Supreme Court held, in finding the action before it moot, that a single subsequent action would suffice to recover damages and to contest the validity of certain ICC orders whose validity was not determined by reason of the mooting of the case. A. L. Mechling Barge Lines, Inc. v. United States, 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961). In *Mechling*, the ICC granted certain railroads temporary authority, pending further consideration, to charge less for certain long hauls of grain than for shorter hauls over the same line or route. Appellant Barge Lines then brought suit, alleging that the proposed railroad rates threatened the extinction of competition. Jurisdiction was founded, as here, on the Urgent Deficiencies Act. As in the instant case, the appellants sought injunctive relief on the ground that the ICC had issued an order in excess of its statutory authority and in violation of the Administrative Procedure Act. While the action was pending before the three-judge district court, the railroads abolished the challenged long haul-short haul discrimination. The railroads and the ICC then moved for dismissal of the pending action on the ground that the action was moot and on the ground that the district court lacked jurisdiction to grant a declaratory judgment. The district court granted the motions to dismiss, and appellant Barge Lines appealed.

Appellants, like plaintiffs in the instant case, argued that the action was not moot, contending that the ICC's temporary order authorizing the rate hike would serve as a defense to any later action by appellants against the railroads for damages suffered while the allegedly unlawful long haul-short haul rates were in effect. The appellant Barge Lines maintained that unless the Supreme Court decided the validity of the ICC order in that action, they would be precluded from attacking the order collaterally, and that "the order must be set aside, if at all, by statutory direct review." 368 U.S. at 329, 82 S.Ct. at 340. The court rejected this argument, finding the case moot and holding that its disposition did not preclude a determination "on any appropriate future occasion" of the validity of the ICC's order and whether the pendency of that order served as a defense for the railroads to a damages action by Barge Lines predicated on the alleged unlawfulness of the ICC order. *Id.* at 330, 82 S.Ct. 337.

We believe that *Mechling* is dispositive of this issue before us.[13] Plaintiffs

---

12. But see Ringsby Truck Lines, Inc. v. United States, 490 F.2d 620 (10th Cir. 1974), cert. denied, 419 U.S. 833, 95 S.Ct. 59, 42 L.Ed.2d 59 (1974).

13. We note that the *Mechling* court found the case moot, despite an allegation by appellant Barge Lines that the challenged order was a continuing one—i. e., part of a continuing practice by the ICC. The court stressed in discussing this point the significance of the concession by the ICC that its challenged order was "fatally defective," thus minimizing the continuing nature of that particular kind of order. While the ICC has not conceded that its special permission orders in the instant case are unlawful, it has both rescinded the challenged orders and declared that it does not expect to re-employ the challenged procedures which brought them about. We believe these circumstances present an effect similar to a concession by the ICC that its orders were invalid. Moreover, we note that while the challenged order in *Mechling* apparently was part of a continuing practice by the railroads and the ICC, there is no allegation here

here,[14] as the *Mechling* plaintiffs, may bring a subsequent action (presumably one pursuant to the Urgent Deficiencies Act), at which time the validity of the ICC order here may be considered, together with whatever antitrust claims may be presented. We thus reject plaintiffs' arguments that this action is not moot on the theory that it must serve as a necessary predicate to a subsequent antitrust action.

## II.

■ We next consider whether the action is moot on the ground that the issues here are likely to recur. As the court observed in *DeFunis*, "There is a line of decisions in this Court standing for the proposition that the 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e. does not make the case moot.' " 416 U.S. at 318, 94 S.Ct. at 1706 (citations omitted). The theory behind this line of cases is that an exception to the mootness doctrine should obtain where there is a risk of the recurrence of the dispute by the same parties, since in such event, the parties will have a present stake in permanently settling the questions in dispute. Here we have little doubt that were a similar dispute to recur, the same or similar parties would be involved. Plaintiffs here are various national associations of shippers who conduct annual business worth millions of dollars; they would certainly have a personal stake in any future actions by the ICC similar to those challenged here.

We are not convinced, however, that similar special permission orders of the ICC are likely to recur.

Plaintiffs contend that the situation which led to the instant litigation is likely to recur, pointing out that the challenged special permission orders arose at a time of sharply increased fuel prices and an ongoing work stoppage by many of the nation's truckers. Plaintiffs suggest that these factors are still with us: fuel prices remain high, and owner-driver demands for reinstitution of the six percent surcharge and overtones of renewed strikes fill the air.

The defendants contend, on the other hand, that the situation which brought about the challenged special orders is not likely to recur, since they were allegedly "emergency measures . . . necessary to meet an unprecedented fuel crisis." [15] They also point out that in its report in Ex Parte, MC–92, *supra*, the ICC concluded:

> [T]he evidence herein does not justify the keeping of this surcharge in effect for an indefinite time. We are satisfied that the fuel costs and other expenses have leveled out somewhat and that the emergency conditions which gave rise to this situation have now passed. Any future increases which may take place can be handled under our normal increase procedures. (emphasis supplied)

Although fuel prices remain high and truckers have renewed talk about engaging in a work stoppage once again, we do not reach the same conclusion as plaintiffs about the likelihood of recurrence of orders like the ones challenged here. In United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), the Supreme Court declared that "[t]he necessary determination [of no mootness] is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." 345 U.S. at 633, 73 S.Ct. at 898.

that the ICC has followed a continuing practice of issuing special permission orders on one-day notice in purported violation of the Commission's own rules and statutory mandates. Thus, assuming *arguendo* that the presence of a continuing practice presented an actual controversy in *Mechling*, as the four dissenting justices argued, the conceded absence of such a continuing practice (in the past) makes this a stronger case for mootness than *Mechling*.

14. See note 9, *supra*.

15. Brief of the United States of America and the Interstate Commerce Commission on the Question of Mootness, at 3.

The Court stated that such a determination must be based on all the circumstances, including, specifically, the "bona fides of the expressed intent to comply [with discontinuing allegedly illegal activity], the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Id,* 73 S.Ct. at 898. A consideration of all the circumstances here leads us to the conclusion that there is not "some cognizable danger of recurrent violation." While the profession by the ICC that it does not expect to resort to similar special permission orders in the future is insufficient to moot the case by itself, that profession, presumably bona fide, may be considered as one factor militating in favor of mootness. In addition, we note that plaintiffs have alleged no past abuse of special permission orders of the ICC. Finally, we observe that the "crisis" circumstances leading to the authorization of the special permission orders suggest that the challenged orders are not likely to recur.

Plaintiffs point us to several cases which they assert stand for the proposition that judicial decision of important questions that are likely to recur should not be defeated by the expiration of short term orders. *See, e. g.* Ringsby Truck Lines, Inc. v. United States, 490 F.2d 620 (10th Cir. 1974); Nader v. Volpe, 154 U.S.App.D.C. 332, 475 F.2d 916 (1973).

*Ringsby* was an action brought by various motor carriers against the United States and the ICC pursuant to the Urgent Deficiencies Act in an effort to set aside an ICC rate cancellation order. The National Small Shipments Traffic Conference and the Drug and Toilet Preparation Traffic Conference—plaintiffs here—intervened as defendants and counterclaimed for restitution for the period between the time an earlier rate cancellation order became effective and the time a superseding rate increase not under challenge became effective. The Court of Appeals held, *inter alia,* that the action had been improperly decided by a three-judge court, since that court had heard the case when the superseding rate increases had already taken effect, and hence the injunctive claims of the motor carriers had been rendered moot. However, the Court of Appeals found that the three-judge court had not considered the restitutionary claims of the shippers, and remanded the case to a one-judge district court to hear those claims declaring that the "shippers are entitled to their day in court." 490 F.2d at 625. Plaintiffs here rely on this language to support their argument that they too are entitled to their day in court. This argument, however, misses the mark. In *Ringsby,* the shippers were seeking restitutionary damages, and the Court of Appeals found that they were entitled to be heard on that issue even though the carriers' claim for injunctive relief had been rendered moot. Here, by contrast, there is no claim for restitutionary damages, and hence, *Ringsby* does not apply.

Plaintiffs also rely on Nader v. Volpe, *supra,* to argue that a court should not be precluded from judging an expired short term agency order capable of repetition. *Nader* was an action for a declaratory judgment that the Secretary of Transportation had exceeded his authority under the National Traffic and Motor Vehicle Safety Act of 1966 by granting the Checker Motors Corporation a temporary exemption from a motor vehicle safety standard he had promulgated. The secretary moved to dismiss the action as moot on the grounds that the exemption had been withdrawn and Checker had come into compliance with the safety standard prior to the hearing before the district court. The Court of Appeals found that the action was not moot, relying in large measure on a post-hearing memorandum by the government which stated that the secretary continued to believe that the Department of Transportation had authority to grant exemptions to a single manufacturer in certain circumstances. Thus, there was a real likelihood that a similar situation might recur. The instant case is clearly different. Unlike the govern-

ment's post-hearing memorandum in *Nader,* the order by the Commission rescinding the special permission orders in issue here stated specifically that the Commission could handle any future increases under its normal procedures, strongly implying that there would be no recurrence of the orders challenged here.

Plaintiffs suggest that this case is "'capable of repetition, yet evading review,' Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, [31 S.Ct. 279, 283, 55 L.Ed. 310] (1911); Roe v. Wade, 410 U.S. 113, 125, [93 S.Ct. 705, 713, 35 L.Ed.2d 147] (1973), and is thus amenable to federal adjudication even though it might otherwise be considered moot." DeFunis v. Odegaard, *supra,* 416 U.S. at 318–319, 94 S.Ct. at 1707.

*Southern Pacific Terminal Co., supra,* the leading case establishing this line of precedents, was an action to enjoin an order of the ICC requiring the plaintiff railroad to cease and desist from giving one shipper undue preferences and advantages in collecting wharfage charges. When the case came before the Supreme Court, the two-year period of the ICC's cease and desist order had expired, thus raising the issue of mootness. In finding that the action was not moot, the Court declared:

> The question involved in the orders of the Interstate Commerce Commission are usually continuing (as are manifestly those in the case at bar), and their considerations ought not to be, as they might be, defeated by short term orders, capable of repetition, yet evading review, and at one time the government, and at another time the carriers, have their rights determined by the Commission without a chance of redress. 219 U.S. at 515, 31 S.Ct at 283.

We do not think the case at bar comes within the ambit of the above-quoted language. First, we do not think the order here presented a continuing ques-

tion, in the sense of one likely to recur, as was the situation presented by the order in *Southern Pacific.* There the Commission order before the court was an ordinary cease and desist order, while here the order was an extraordinary one instituted to meet a fuel crisis.

Second, even though there is a possibility that the situation which led to the challenged special permission order might recur (although we do not think such recurrence likely), there is no reason to believe that similar ICC special permission orders will evade review on a subsequent occasion. We believe we are entitled to take on good faith the declaration of the ICC that it expects to utilize normal rate-making procedures in the future.[16]

Third, a review of recent cases citing *Southern Pacific* suggests that its language has been applied to situations clearly distinguishable from the one before us. *See, e. g.,* Brown v. Chote, 411 U.S. 452, 93 S.Ct. 1732, 36 L.Ed.2d 420 (1973) (elections); Rosario v. Rockefeller, 410 U.S. 752, 93 S.Ct. 1245, 36 L. Ed.2d 1 (1973) (elections); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L. Ed.2d 147 (1973) (pregnancy). In a recent case where the court distinguished *Southern Pacific,* Diffenderfer v. Central Baptist Church, 404 U.S. 412, 92 S. Ct. 574, 30 L.Ed.2d 567 (1972), the court found that an action challenging a tax exemption for a church parking lot used, *inter alia,* for commercial purposes was moot, where the statute in question had been repealed and where the church parking lot was not fully exempt from taxation under the new statute. Similarly, in the instant case, the challenged ICC order has been rescinded and replaced with new orders not attacked by plaintiffs.

## III.

■ We next turn to plaintiffs' contention that this action should not be

16. In the event that another crisis arises which forces the ICC to resort again to special permission orders similar to those here, a court considering a challenge to *those* orders would undoubtedly be justified in finding that action not moot on the rationale of *Southern Pacific.*

disposed of as moot on the ground that the issues here are of great public importance. We agree that the issues are of substantial importance to the public, but we do not believe that that conclusion alone warrants a finding that this case is not moot. In DeFunis v. Odegaard, *supra,* the court indicated that the mere presence of important public issues is not sufficient to prevent a finding of mootness. 416 U.S. at 316, 94 S.Ct. 1704. In fact, the Supreme Court has specifically rejected the proposition that it can decide cases otherwise moot on the sole ground that the action involves issues of public importance. Street Employees Div. 998 v. Wisconsin Employment Relations Bd., 340 U.S. 416, 418, 71 S.Ct. 373, 374, 95 L.Ed. 389 (1951). Since we have found that this action is otherwise moot, it cannot be decided on the sole ground that there are issues of public importance present.

For the reasons above stated, we dismiss the action before us as moot.

So ordered.