## COMMONWEALTH *vs.* GEORGE ANASTOS
### (and companion cases).

Suffolk. February 3, 2003. - March 18, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Controlled Substances. Contempt. Moot Question. Practice, Civil,* Moot case.

An appeal from a judgment of contempt entered against the Commissioner of Probation by a judge in the District Court, arising from issues involving the random drug testing of persons convicted of various drug offenses who were sentenced to a community corrections program as a condition of probation, was moot, where, in the time this appeal was filed, all the probationers involved in this case had successfully completed their sentences, the judge had terminated the drug testing orders and vacated the contempt judgment, and the issues involved were unlikely to arise again in substantially the same form. [849-850]

COMPLAINT received and sworn to in the Brighton Division of the District Court Department on July 16, 1998.

An adjudication of contempt was entered on April 25, 2002, by *R. Peter Anderson*, J., and an order terminating the contempt proceeding was entered on August 19, 2002, by him.

The Supreme Judicial Court granted an application for direct appellate review.

*James J. Arguin*, Assistant Attorney General, for Commissioner of Probation.

*Thomas T. Merrigan & James W. Dolan*, for Brighton Division of the District Court Department, amicus curiae, submitted a brief.

COWIN, J. The Commissioner of Probation (commissioner) appealed from a judgment of contempt entered against him by a judge in the District Court, and we granted his application for direct appellate review. However, the judge has vacated the contempt judgment. The appeal is moot and is therefore dismissed.

We sketch the factual background. The defendants in the underlying criminal proceedings were convicted of various drug offenses in the "drug court sessions" of the Brighton and Roxbury Divisions of the District Court Department.[1] Each was sentenced to a "Level II" community corrections program as a condition of probation. See G. L. c. 211F, § 3 (providing for sentence to community corrections program for certain offenders).[2] As of January, 2002, as part of their probation the defendants here were required by court order to be tested randomly for drugs at specified intervals by the office of community corrections (OCC), which operates the community corrections programs (see G. L. c. 211F, § 2). The order entered in the defendant Anastos's case is representative:

> "I order the Office of Community Corrections to conduct random drug testing at least one time per week until December 20, 2002 or further order of the court. I further order that all results, positive and negative, be reported to the Brighton Probation Department by noon of each Tuesday."

The OCC operates under the direction of the office of the commissioner. G. L. c. 211F, § 2 (*c*). On December 11, 2001, the office of the commissioner had issued a memorandum

---

[1]According to the trial court policy for drug court sessions, these are essentially sessions involving "intense court supervision," whose typical cases are those of "repeat offenders . . . severely addicted to narcotic drugs, alcohol or other harmful substances."

[2]Section 3 of G. L. c. 211F provides, in relevant part:

> "(*a*) Any court exercising jurisdiction is authorized to sentence any eligible offender to a community corrections program . . . .

> "(*b*) The court may dictate the duration and conditions of the sentence in a community corrections program for any period of time consistent with existing law.

> "(*c*) A sentence to a community corrections program shall be imposed as a condition of probation consistent with chapters two hundred and seventy-six and two hundred and seventy-six A. The court may modify the sentence of an offender serving a sentence in a community corrections program in the same manner as if the offender had been placed on probation. . . ."

reflecting a change in drug testing protocols. This was in response to a November 27, 2001, memorandum from the Chief Justice for Administration and Management of the Trial Court (CJAM) expressing concern that "[e]xceptional measures" would be required due to "a very difficult fiscal situation."[3] Specifically, she stated that funding in an account covering "Non Employee Services" was "$1.8 million less than needed to cover costs for services related to the processing of cases [including] the cost of drug testing." She sought "suggestions" on how to reduce such expenses without delaying case processing. The commissioner's office responded with the December 11 memorandum. Effective December 11, 2001, only limited testing would be afforded to Level II probationers. Subject to fiscal restraints at any particular testing center, Level II probationers would be tested twice a month. Testing would terminate if, inter alia, the probationer submitted negative test samples for ninety consecutive days (i.e., six negative tests over the three-month period). The judge recognized that, because of the December 11, 2001, memorandum, the defendants' sentences were not being executed as ordered.

There followed a series of hearings at which the judge required the commissioner or his representative to appear. We need not discuss each hearing in detail. The essence of the judge's orders was that the probationers be tested at the frequencies he ordered at the same level of scientific accuracy as the testing that had previously been done for OCC by a specific laboratory (batch analyzer testing). The commissioner asserted that drug testing using "test cups" was as scientifically reliable as batch analyzer testing. The commissioner at one point indicated that he had complied with the judge's orders, but in reality he was using test cups, a testing method the judge said he had specifically rejected. Eventually (after being ordered to do so by the CJAM), the commissioner agreed to provide batch analyzer testing, provided it was administered by local proba-

---

[3]There is no indication on the face of the December 11, 2001, memorandum that a copy was sent to the CJAM.

tion officers, rather than directly by the OCC.[4] The judge, however, evidently frustrated by what he termed "flouting" of his orders as well as certain other conduct that the judge described as evidencing "defiance and mendacity," insisted that the testing be done at OCC and, when the commissioner refused, held him in contempt. He ordered the commissioner held in "civil jail"[5] and fined until he complied. The commissioner quickly complied.

From the beginning it was the position of the commissioner that the issues of method, frequency, and location of testing were issues of allocation of resources, and were within his discretion to decide, any dispute being resolved in the first instance by the CJAM as an administrative matter. The judge's order was not lawful, in the commissioner's view, and in any event, it was not appropriate for the judge to use his contempt power to force the commissioner to allocate resources differently from the manner the commissioner wished. The judge, however, defined the issue as one that went to the heart of his judicial authority, and believed that the commissioner's conduct was insubordinate and that his representations to the court were designed to mislead. He rejected the proposed drug testing alternatives as being of inferior quality.

In the time since this appeal was filed, all the probationers involved in this case successfully completed their sentences. The judge terminated his drug testing orders and vacated the contempt judgment. This appeal is therefore moot. See *Commonwealth v. Rape Crisis Servs. of Greater Lowell, Inc.*, 416 Mass. 190, 192-193 (1993). We have at times expressed our opinion on moot questions "because of the public interest involved and the uncertainty and confusion that exist" or because there is an issue that is "capable of repetition, yet evading review." *Metros v. Secretary of the Commonwealth*, 396 Mass. 156, 159 (1985), quoting *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). See *Lockhart v. Attorney Gen.*, 390 Mass. 780, 782-784 (1984). The issues in these cases

---

[4]In the end, the commissioner conceded that the test cup method is not the equivalent of the batch analyzer testing, though he considered test cups "reliable."

[5]The record does not indicate what this term means.

are unlikely to arise again in substantially the same form. We trust that the commissioner, under the supervision of the CJAM, will devise a means of providing the type, frequency, and duration of drug testing necessary to support the mission of the drug court sessions. "If, in fact, the issues should reappear, they need not evade review before they become moot. The litigants and this court will be in a position, respectively, to present and to decide them promptly." *Id.* at 785. See *First Justice of the Bristol Div. of the Juvenile Court Dep't* v. *Clerk-Magistrate of the Bristol Div. of the Juvenile Court Dep't, ante* 387, 407-408 (2003).

*Appeal dismissed.*